PITTMAN, Judge.
In these consolidated appeals, G.S. ("the mother") and D.Je.S. ("the father") appeal from judgments of the Cullman Juvenile Court ("the juvenile court") terminating their parental rights to their four children, namely, D.Ja.S. ("the oldest child"), a son born in May 2000; W.J.S. ("the second-born child"), a son born in July 2001; S.E.S. ("the third-born child"), a son born in December 2003; and J.K.S. ("the youngest child"), a son born in November 2005.
Procedural History
In November 2012, the juvenile court found the children to be dependent and awarded the Cullman County Department of Human Resources ("DHR") temporary custody of the children. In March 2016, DHR filed petitions seeking the termination of the mother's and the father's parental rights to each of the children. In January 2017, the juvenile court tried all four termination-of-parental-rights actions together. Later that same month, the juvenile *386 court entered separate judgments in each of the actions terminating the mother's and the father's parental rights to each of the children. The mother and the father each filed postjudgment motions, which were denied by operation of law. Thereafter, the mother and the father each timely appealed to this court. A licensed court reporter recorded the trial stenographically and transcribed it, and the record contains the transcript. Therefore, this court has jurisdiction over these appeals pursuant to Rule 28(A)(1)(c)(ii), Ala. R. Juv. P.
Pertinent Evidence
The mother, the father, and the four children lived in Morgan County from 2005 through 2011 before moving to Cullman County in 2012. Regarding the period from 2005 through 2011, the mother testified:
"Q. [By DHR's counsel:] Okay. Now, we have a report from Morgan County. Were those-were y'all in the-were you and the children in an abusive relationship with [the father] then from 2005 through 2011 where those reports were?
"A. Yes.
"Q. And were both of y'all involved in drug use then, 2005 through 2011?
"A. Yes."
Regarding the period before November 2012, the father testified:
"Q. [By the father's counsel:] Okay. How has your behavior changed since 2012 when your kids were taken from you by DHR?
"A. Well, back then, all I could think about-I was-now, I was doing what I could to meet their needs, but I was also thinking more of my wants, which was the drug abuse.
"....
"Q. [By DHR's counsel:] Yeah. Okay. But during that period of time, that was most important to you? I think you've testified to that. That was primary on your mind?
"A. When you're hooked on something, it's hard to get away from it.
"Q. Yeah.
"A. I was very hooked on drugs at that point in time.
"Q. How often were y'all using at that point?
"[By the mother's counsel]: Objection to the word y'all.
[By DHR's counsel]: You can object all you want to. He knows whether they were using or not.
"THE COURT: I'm going to allow it.
"A. Do I need to say y'all as we were in a whole?
"Q. (By [DHR's counsel] ) Yeah, I want you to answer for you and [the mother].
"A. At the time we were using when we lived in Cullman County-now, I'm not talking about Holly Pond.
"Q. Holly Pond is in Cullman County?
"A. We wasn't using in Holly Pond.
"Q. Okay.
"A. We lived down here off 31 in a trailer park in Cullman.
"Q. Okay.
"A. We would-it was in spurts. Sometimes it would be a week-long thing, maybe two-weeks thing and sometimes it would go two or three months without using.
"Q. On using, would you use during those periods-you said a week, sometimes two weeks. Would you use everyday?
"A. Not everyday, no.
"Q. Okay.
A. We didn't have to use everyday when you did meth[amphetamine].
"Q. Okay. How long would the thrill from that last typically?
*387 "A. A day, two days.
"Q. Okay.
"A. It depends on the drug.
"Q. And did-during those periods of times, would she use each time you did?
"A. We used together, yes.
"Q. Okay. Were there any times you were using that she wasn't using?
"A. When we were arguing, yes.
"Q. Was there sometimes she was using and you weren't using?
"A. Yes.
"Q. And did she use marijuana a lot?
"A. We was on meth[amphetamine]. We didn't use no marijuana at that time. That was a long time ago.
"Q. And then later on, did she use marijuana more?
"A. Like I said, we were on meth[amphetamine]. Marijuana wasn't in the picture.
"Q. Okay. Did you ever see her smoke marijuana at all?
"A. When we lived by my daddy, we smoked it together.
"Q. Okay. Did you ever see her smoke it with any of the children?
"A. Yes, I did.
"Q. Which children was that?
"A. [The third-born child and the second-born child].
"Q. Okay.
"A. And I think [the oldest child] might have tried it and throwed it down."
In November 2012, the oldest child's school reported to DHR that the father might have physically abused the oldest child and the youngest child, and DHR investigated the report. Certified copies of court records evidencing the father's criminal record before November 2012 were introduced into evidence without objection. Those records established that the father had been convicted on two charges of third-degree domestic violence based on an incident in 2009 in which he had hit the mother; had hit D.S. ("the paternal grandfather"), the children's paternal grandfather; and had fired a shotgun. Those records also established that, in 2012, the father had been convicted of driving under the influence. In addition, those records established that, in 2012, the mother had filed an action seeking a protection-from-abuse order against the father, although that action was subsequently dismissed at her request. After investigating the November 2012 report from the oldest child's school, DHR removed the children from the custody of the mother and the father and filed dependency petitions. The juvenile court found the children to be dependent and awarded DHR temporary custody of the children.
DHR initially placed the children in a single foster home; however, the children engaged in physical fights with one another and had to be separated and placed in therapeutic foster homes. The oldest child and the youngest child were placed in one therapeutic foster home, while the second-born child and the third-born child were placed in another. While the children were in therapeutic foster homes, counselors associated with those therapeutic foster homes counseled the children. In addition, DHR arranged for Greg Graham, a licensed professional counselor, to counsel the children. Christy Webb, the DHR caseworker who handled the children's cases from August 2013 to May 2014, testified that, while the oldest child and the youngest child were in the same therapeutic foster home, there had been frequent conflict and physical fighting between them and that the youngest child had head-butted the foster mother and had hit the foster mother's adult son.
In February 2013, the mother and the father each submitted lists of possible relative *388 resources. The mother's list named V.O. ("the maternal grandmother"), the children's maternal grandmother, who lived in Mississippi; A.L., one of the children's maternal aunts, who also lived in Mississippi; T.O., another of the children's maternal aunts, who lived in Alaska; and D.A.M., the mother's stepmother, who lived in Alabama. In addition, she listed her father, who she stated was deceased, and two maternal uncles of the children, who she stated were "unavailable." She did not list any contact information for the two maternal uncles. The father listed the paternal grandfather and his wife; J.F.B., the children's paternal grandmother; T.S., J.W.S., D.M.S., and W.D.G., who were the children's paternal uncles; and J.S., one of the children's paternal aunts. All the relatives listed by the father lived in Alabama.
Webb testified that she had investigated the possibility of placing the children temporarily with the mother's and the father's relatives. She testified that she had rejected the maternal grandmother as a relative resource for temporary placement of the children and explained why:
"Q. [By DHR's counsel:] All right. And did you make any determination while you were working the case about their-them being suitable to have the children?
"A. [The maternal grandmother] was a real doubt because I ... gave [the maternal grandmother] a drug screen in August of 2013 and she tested positive for marijuana. She also had reports in Morgan County of an indicated report of her smoking marijuana with [the mother] when [the mother] was fifteen years old. There is also another indicated report of [the maternal grandmother] putting the kids at harm due to her drinking and her boyfriend's drinking. And then there was also reports of [the maternal grandmother's] children seeing violence between her and her husband when she was trying to harm him. So we ruled her out because of that current drug screen that I gave her and that report she'd had of marijuana."
The mother testified that the husband of A.L., the maternal aunt who lived in Mississippi, did not want the children to live with them.
Webb testified that, in October 2013, T.O., the children's maternal aunt who lived in Alaska, had contacted Webb and had expressed an interest in having the children temporarily placed with her; however, T.O. informed Webb that she was then living in a one-bedroom house but was about to move into a bigger house. T.O. and Webb agreed that, after T.O. had moved into a bigger house, she would contact Webb about requesting that a home study be performed by DHR's counterpart in Alaska pursuant to the Interstate Compact on the Placement of Children ("ICPC"). In April 2014, T.O. telephoned Webb and left a message that she was still living in a one-bedroom house.
Despite the father's having named eight family members as possible relative resources on the written list he had given DHR in February 2013, Webb testified that the father had told her that the only relatives of his who would be appropriate to serve as relative resources for temporary placement of the children were the paternal grandfather and T.S. and W.S., one of the children's paternal uncles and his wife. Webb testified that she had rejected the paternal grandfather and his wife as relative resources because the children had told her that the paternal grandfather and his wife had drugged them with NyQuil, an over-the-counter medicine intended to treat the symptoms of the common cold, and the prescription drug Xanax to make them sleep when they stayed with the paternal grandfather and his wife.
*389 Webb testified that she had sent T.S. and W.S. a letter inquiring whether they would be interested in having the children temporarily placed with them and that she had never received a response from them.
Webb further testified that, in January 2014, she had sent the children's maternal great-uncle and great-aunt, R.S. and D.S. ("the maternal great-uncle and great-aunt"), who live in Tennessee and who were not named on the mother's list of relatives, a letter inquiring whether they would be interested in having the children temporarily placed with them. The maternal great-uncle and great-aunt responded in the affirmative, so Webb explained to them that they would have to send her a letter meeting the requirements of the ICPC so that she could request an ICPC home study by DHR's counterpart in Tennessee. The maternal great-uncle and great-aunt sent Webb the requisite letter, and Webb initiated the process for obtaining a home study of the maternal great-uncle and great-aunt by DHR's counterpart in Tennessee.
Melissa Welch, the DHR caseworker who took over the handling of the children's cases from Webb in May 2014, testified that she had received the ICPC home-study report indicating that the maternal great-uncle and great-aunt had been approved for temporary placement of the children. Initially, the oldest child and the youngest child were placed with the maternal great-uncle and great-aunt on a trial basis in December 2015. The second-born child and the third-born child subsequently went to the maternal great-uncle and great-aunt's house for a visit with the oldest child and the youngest child. During that visit, the four children physically fought with each other, and the oldest child had "almost punched [the second-born child] out." DHR's counterpart in Tennessee decided that the maternal great-uncle and great-aunt would not be able to handle all four of the children, so the second-born child and the third-born child remained in a therapeutic foster home in Alabama. The maternal great-aunt testified that, on one occasion while the youngest child was living with her, the youngest child had gotten angry over something the oldest child had done and that, when she tried to calm the youngest child, he had thrown a digital-game player at her and had hit her. After approximately six months, the youngest child was returned to DHR's custody at the request of the maternal great-uncle and great-aunt, and DHR placed him in a therapeutic foster home in Alabama.
When the actions were tried, the oldest child was living with the maternal great-uncle and great-aunt, and the second-born child and third-born child were living together in the same therapeutic foster home in Alabama where they had been living for the previous two years. The youngest child, who had been hospitalized twice with emotional problems since November 2012, had recently been moved to a new therapeutic foster home in another county because he had struck the foster mother at his previous home with his book bag. Welch testified that the youngest child had been doing well at the therapeutic foster home in another county; however, DHR had been notified by the authorities in that other county that DHR would have to transfer the youngest child to another therapeutic foster home, so DHR was in the process of transferring him to another therapeutic foster home when the actions were tried.
Welch testified that the children are afraid of the father. The maternal great-aunt testified that the oldest child wants to visit and communicate with the other three children, but the other three children do not want to talk to the oldest child. She *390 further testified that the oldest child vacillates regarding whether he wants to talk to the mother and the father. Welch testified that the youngest child will not visit the oldest child because the oldest child used to hit the youngest child while he was living with the oldest child at the maternal great-uncle and great-aunt's house and, consequently, the youngest child is afraid of the oldest child. The children's guardian ad litem stated that the second-born child and the third-born child had told her that they were happy where they were living in therapeutic foster care and that they wanted to remain there. She, too, stated that the oldest child vacillates regarding whether he wants a relationship with the mother and the father. Welch testified that she had talked to the oldest child a few days before trial and that he had stated that he wanted the juvenile court to terminate the mother's and the father's parental rights, that he would like to have visits with the mother but did not want to live with her, and that he did not want to visit with the father at all. The maternal great-aunt testified that she was willing for the oldest child to continue to live with her but that she had no plans to adopt him.
After the juvenile court awarded DHR temporary custody of the children in November 2012, DHR required the mother and the father to submit to random drug testing, to undergo substance-abuse assessments by Mental Health of Cullman ("MHC"), and to comply with any recommendations made by MHC. In addition, DHR required the mother and the father to complete parenting classes, required the father to complete an anger-management program and a domestic-violence-intervention program, and required the mother to complete a program provided by a support group for victims of domestic violence. The father completed an anger-management program in March 2013, and the mother and the father both completed parenting classes in May 2013. In June 2013, the mother and the father both underwent substance-abuse assessments at MHC. Webb testified that MHC had recommended that the father complete a program of intensive outpatient ("IOP") treatment for substance abuse and that the mother receive individual counseling for reported symptoms of depression and anxiety. The father began IOP treatment with MHC but failed to complete it. He testified that, in the winter of 2014, he had completed IOP treatment in another county but did not introduce any corroborating evidence. The father did not complete a domestic-violence-intervention program in Cullman County. He testified that he had completed such a program in another county but did not introduce any corroborating evidence. The mother attended only one individual counseling session at MHC.
In August 2013, the father was arrested on a domestic-violence charge. Webb testified that the father had been arrested on that occasion for hitting the mother in the head with a small wooden bat. The father testified that the weapon he had used to hit the mother was a wooden stick with a diameter that was approximately the same as that of a quarter. Webb testified that, in August 2013, drug tests performed on both the mother and the father had indicated the presence of amphetamine and methamphetamine in their systems. Webb further testified regarding a conversation she had had with the father in mid-October 2013:
"Q. [By DHR's counsel:] Okay. Now also there was a time or-I guess that you had a discussion with [the father] about what the recent history or background was pertaining to any drug use between-with him and [the mother], before she left [for Alaska in September 2013]?
"A. Oh, yeah.
*391 "Q. And do you recall what that was about?
"A. He had told me when I talked-it was right when he got out of jail [in mid-October 2013] he told me, he said he was going to be honest with me. He told me that the last court that they came to that him and her had been up for like two weeks on-because of like meth[amphetamine]. He had said that they had been-I asked him about how they were passing drug screens and he said that they would drink lemon juice and water or take some kind of pills. And then they would use BioWash for like hair drug screens.
"Q. Okay.
"A. And he had also told me that [the mother] and [the maternal grandmother], I think it was right before he went to jail [in August 2013 on a charge of third-degree domestic violence] or something, were at their house and they were smoking marijuana together."
The father testified:
"Q. [By DHR's counsel:] Okay. It's also in the record where you said to a [DHR] worker that prior to the court appearances that you and [the mother] had spent two weeks on meth[amphetamine]; is that correct?
"A. Yes, we spent a lot of time on meth[amphetamine].
"Q. And did y'all do some things to try to alter a drug screen that you knew you would be taking?
"A. Yeah.
"Q. And did that work to get you clean drug screens?
"A. Sometimes it did, sometimes it didn't.
"Q. Y'all tried often?
"A. Not often. We never did have the money enough to try it often.
"Q. You got as far as the stuff to clean it up or give you clean screens; is that what you're talking about?
"A. Yeah."
The mother and the father both testified that they had not used any illegal drugs since August 2013, and the record contains no evidence indicating that they had.
In September 2013, the mother moved to Mississippi for a couple of weeks and then moved to Alaska where T.O. was living. The mother was still living in Alaska when the actions were tried and traveled from there to Cullman County for the trial. After moving to Alaska, the mother initially lived with T.O. and then moved into a one-bedroom apartment. She was living in a one-bedroom apartment with her boyfriend when the actions were tried. She testified that she had not yet divorced the father because she did not have his address.
The mother initially testified that she had moved to Alaska in September 2013 because the father had abused her and because DHR had told her it was in her best interest to move to Alaska. She further testified that she had not wanted to move to Alaska; that she could have stayed in Mississippi with A.L., the children's maternal aunt who lives there; and that she probably would not have moved to Alaska if DHR had not told her to do so. However, when cross-examined by DHR's counsel, the mother testified:
"Q. [By DHR's counsel:] Well, is moving to Alaska a pretty extreme thing to do when you've got kids down here in Alabama?
"A. Maybe so.
"Q. Okay.
"A. But I think I needed that for my sanity, for my stability, for my-yeah. And I know it's not about me, it's about the kids.
*392 "Q. What were you trying to get away from?
"A. [The father].
"Q. Okay. Is Alaska the only place-when you were living in Mississippi, would he bother you over there?
"A. I couldn't take the chance. I was scared."
(Emphasis added.) Similarly, when cross-examined by the children's guardian ad litem, the mother testified:
"Q. (By [the children's guardian ad litem] ) How you as a mother can move that far away, but yet be here today saying that you want your boys. So explain to me why you felt like it took that far away for you to go?
"A. I think I explained it once already. But I needed the stability from my sister. She was there, you know, she was able to help me. And I don't-here in Alabama, I don't really have family support like I do in Alaska with my sister. She's been more supportive to me through all of this than any of my family. Besides [the maternal great-aunt]."
(Emphasis added.)
Webb, the caseworker who was handling the children's cases when the mother moved to Alaska, testified:
"Q. [By DHR's counsel:] Ms. Webb, there has been testimony that you had told [the mother] that she needed to go to Alaska. Are you aware of that?
"A. That is not correct.
"Q. Okay. Can you tell us how you found out that [the mother] wanted to go to Alaska?
"A. On August 27th, 2013 I got a call from [the maternal grandmother], and she said that her and her sisters had been talking about [the mother's] situation and [the mother] said that it was best for her to go to Alaska.
"Q. Okay. And had they, [the maternal grandmother] and some family members, made arrangements for [the mother] then to go to Alaska?
"A. [The maternal grandmother] told me that she was coming to get [the mother] the next week and [the mother] was going to stay a couple of weeks with her and then she was going to fly to Alaska, I think, on September 18th because that was the soonest they could get a flight for her.
"Q. And then did you receive a call from [the mother] about her going to Alaska?
"A. I did. Later on that day, I received a call from her and she said that she planned for [the maternal grandmother] to come and get her and her stay with [the maternal grandmother] until she flew to Alaska. She said she was going to go live with her sister because she was the only one that would open a door for her and she knew that she couldn't stay here.
"....
"Q. (By [DHR's counsel] ) So at no time or at any time did you tell [the mother], hey, you need to move to Alaska?
"A. No, I did not.
"Q. Did you tell her she needed to move [to] Mississippi?
"A. No, I did not."
The mother testified that Alaska is approximately 4,000 miles away from the children and that an airplane ticket for round-trip flights between Alaska and Alabama costs approximately $700. Regarding her continuing to live in Alaska over three years after having moved there in September 2013, the mother testified:
"Q: [By DHR's counsel:] Okay. Have you ever considered since you've been in Alaska that you could move back and be closer to [the children]?
"A. Yes.
*393 "Q. What are your thoughts about that?
"A. Um-
"Q. What's holding you in Alaska other than your boyfriend?
"A. And he's not holding me there. It's the fact that I have-
"Q. Well, you don't have a job. You've got a one-bedroom apartment, you've got a boyfriend and he's not the reason, you said. So what is it?
"A. I have stability there.
"Q. Is it because they have legal marijuana?
"A. No.
"Q. All right, I was just wondering. Now, you say you have stability. I was just wondering, could you have that same stability in Tennessee or Mississippi?
"A. Maybe. My thing is I was trying to change playgrounds and playmates and like-you know, just using people and-not using people. People that were using and that, you know, was my thing. I had to go, you know, and I had to get clean and a better head on my shoulders because that's what I want. You know, I want to be stable for my children."
The mother testified that, after moving to Alaska, she had initially worked for five months for a cleaning service and that she had made $1,175.41 per month while working for that cleaning service. The mother further testified that, during the two years immediately preceding the trial of the actions, she had worked as a housekeeper and sitter for an elderly, wheel chair-bound woman and that she had been paid $200 per month for that work. She also testified that she was attempting to obtain the health-care training necessary to obtain a job in an assisted-living facility and that she had completed a course in cardiopulmonary resuscitation and first aid. The mother testified that she had lived with her boyfriend in a one-bedroom apartment for approximately three years, that her rent is $820 per month, and that her power bill is approximately $100 to $110 per month. She provided DHR with evidence indicating that she had attended 10 free counseling sessions with a licensed professional counselor in Alaska and that she had participated in a program for victims of domestic violence for which she had paid approximately $650. Welch testified that she had obtained approval for DHR to pay a provider to perform random drug tests on the mother, but, when Welch tried to communicate that information to the mother by telephone, Welch had not been able to reach her. Welch testified that the mother had stopped communicating with her, but the mother disputed that testimony.
Webb testified that DHR had provided the mother and the father with supervised visitation and that the mother had visited the children on August 29, 2013, before moving to Alaska in September 2013. Webb further testified that, after she had moved to Alaska, the mother had telephoned Webb and had asked Webb to arrange a visit with the children when the mother visited Alabama in May 2014. Webb made the arrangements, and Welch, who had taken over the children's cases in May 2014, testified that the mother had visited the children in May 2014. Welch further testified that the three youngest children had attempted to maintain contact with the mother by telephone and by Skype, which is a means of communicating via a computer using a Web camera, but that the mother often did not answer their calls, and that, when she did answer their calls, she was usually distracted and talking to someone else in the room while she was on the telephone with the children. Welch testified that the three youngest children felt that the mother had abandoned them and that, eventually, they had *394 refused to visit or talk to her. The mother testified that she had spoken to the third-born child on the telephone in August 2016, but he had terminated the conversation after he had asked her one question and she had answered it. She further testified that, in August 2016, she had participated by telephone in an Individualized Service Plan ("ISP") meeting and that the second-born child and the third-born child had told her that they did not want to talk to her. She denied that she had ever refused to answer the youngest child's telephone calls or to communicate with him by Skype. She testified that, in September 2016, she had come to Alabama and had asked to visit with the three youngest children, but DHR had told her that the three youngest children did not want to talk to her. The mother further testified that, when she had asked Welch why the three youngest children did not want to talk to her, Welch had told her that they thought she had abandoned them. When questioned by the children's guardian ad litem regarding her relationships with the children, the mother testified:
"Q. [By the children's guardian ad litem:] So you're telling me that you have no idea why they don't want to have anything to do with you?
"A. I really don't, other than they think I abandoned them.
"Q. And there's nothing else? Do you think that they feel like maybe you were not protective of them and that you let all of this stuff happen to them to be abused by their dad?
"A. I know I didn't do my fair share and take care of them the way I should have, but things are different now.
"Q. But they're not different for the boys. The way they feel is not different towards you. They're angry, they're hurt. And really, you don't even know them, do you, now?
"A. Um, three of them, no. But one, yes."
The mother testified that she has been diagnosed with migraine headaches and has been prescribed marijuana syrup to treat her migraine headaches. She introduced into evidence a Medical Marijuana Registry Patient Card issued to her by the State of Alaska. She also testified that a licensed professional counselor had diagnosed her with post-traumatic stress disorder. The maternal great-aunt testified that she had seen the mother three times since 2014 and that the mother had not appeared to be on drugs on those occasions. S.W., one of the mother's cousins, testified that the mother did not appear to be using illegal drugs any more; however, she testified that most of her contact with the mother was by telephone or Facebook Messenger, an instant-messaging service.
On April 30, 2015, the mother sent DHR a letter requesting that an ICPC home study be performed on her home in Alaska. Welch testified that the letter did not meet the requirements for initiating a request that Alaska perform an ICPC home study because it did not expressly state that the mother would agree to be financially responsible for the support of the children and because it did not identify who, if anyone, was living with the mother. Welch testified that, in June 2015, she had sent the mother a letter notifying her of the deficiencies in the mother's letter requesting an ICPC home study and specifying what the mother needed to add to the letter in order to initiate the request for an ICPC home study. DHR's file did not contain a copy of Welch's letter; however, Welch testified that she specifically remembered sending the letter. Welch testified that she did not receive an amended letter from the mother or any other communication regarding an ICPC home study *395 from the mother after sending the June 2015 letter.
In October 2016, approximately four years after the children had been removed from the custody of the mother and the father, approximately seven months after DHR had filed the termination-of-parental-rights petitions, and approximately three months before the trial of the actions, T.O., the children's maternal aunt who lives in Alaska, sent DHR a letter requesting that an ICPC home study be performed on her home so that the children could be placed with her. DHR did not request an ICPC home study on T.O.'s home.
Webb testified that, after the father had been arrested in August 2013 on the charge of third-degree domestic violence based on his having hit the mother in the head with the wooden bat or stick, he had remained in jail until mid-October 2013 and had gone back to jail later in October 2013. Webb further testified that, after the father had been released from jail a second time, his supervised visitation was suspended because of concerns regarding his mental stability. DHR had the father submit to a mental evaluation and reinstated his supervised visitation in March 2014. Welch testified that, after she had taken over the children's cases from Webb in May 2014, the father's supervised visitation had been suspended because he was behaving inappropriately at the visits. Welch testified that subsequently his supervised visitation was reinstated and that he father had behaved appropriately since the second reinstatement of his supervised visitation.
Regarding his relationships with the children when the actions were tried, the father testified:
"Q. [By DHR's counsel:] Now, what about visits with your children now, are you talking to them on the phone?
"A. No, sir.
"Q. Are you visiting with them at all?
"A. No, sir.
"Q. When was the last time you visited with them?
"A. The last actual visit with them was that ISP we had in August. I can't tell you the date.
"Q. August of last year?
"A. This past year, yeah. I had a couple of phone calls after that, but-maybe two or three, but that was it.
"Q. Okay. And why are you not visiting with them?
"A. They told the caseworker that they didn't want to talk to me or their mother.
"Q. Okay. And do you understand why they're upset with you?
"A. Of course I do.
"Q. Why is that?
"A. Because it took too long to straighten up and try to get them back."
The father testified that he had been released from jail the last time in January 2014; that, in February 2014, he had paid off a fine imposed for his conviction of driving under the influence; and that his term of probation had ended when he had paid off that fine. Between the date of his final release from jail in January 2014 and April 2014, the father worked briefly for two different employers. He testified that, in April 2014, he had obtained full-time employment with a construction company and that he was still employed by that construction company when the actions were tried. He further testified that he was earning $15.50 per hour and that he was working 40 hours per week when the actions were tried. Webb and Welch testified that the father had never provided DHR with any financial support for the children. Webb testified that, in December *396 2013, the father had provided Christmas gifts for the children.
Webb and Welch testified that the mother had never provided DHR with any financial support for the children. Webb testified that the mother had given the children some gifts on one occasion while Webb was assigned to the children's cases, and Welch testified that, while she was assigned to the children's cases, the mother had brought the children some Christmas ornaments, but the children would not accept them.
A.K.C. testified that she had known the father for approximately 20 years; that she had begun a romantic relationship with the father in 2014; that they had had an argument, which had resulted in their ceasing their romantic relationship for approximately 6 weeks; and that they were again having a romantic relationship when the actions were tried. She further testified that, although she was not living with the father when the actions were tried, she had lived with him for approximately a year and a half before they temporarily ceased their romantic relationship for six weeks and that he had never physically abused her. She also testified that she had been present when the father visited with the children at the August 2016 ISP meeting, that the father had been happy to see the children, that the father had been nice to the children during that visit, and that the children had been happy to see the father at that visit.
Regarding the issue whether the children would be adoptable if the mother's and the father's parental rights were terminated, Welch testified:
"Q. [By DHR's counsel:] Okay. Now, given the fact that these children have aggressive behaviors and the problems that's been talked about that you're aware of as their caseworker, does that in itself make these children unadoptable?
"A. Definitely not [the second-born child and the third-born child], they've been settled in that place. And I know [the oldest child] wants to stay where he is. And [the youngest child] is doing so much better, so I don't think any of this makes them unadoptable."
Standard of Review
"[W]e will reverse a juvenile court's judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence. F.I.[v. State Dep't of Human Res. ], 975 So.2d [969] at 972 [ (Ala. Civ. App. 2007) ]." J.C. v. State Dep't of Human Res., 986 So.2d 1172, 1183 (Ala. Civ. App. 2007). Clear and convincing evidence is:
" ' "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
" '§ 6-11-20[ (b) ](4), Ala. Code 1975.'
" L.M. v. D.D.F., 840 So.2d 171, 179 (Ala. Civ. App. 2002)."
J.C., 986 So.2d at 1184 (emphasis omitted).
Analysis
When a nonparent seeks termination of a parent's parental rights, a juvenile court's determination whether to terminate those rights is governed by a two-prong test: (1) whether clear and convincing evidence establishes that the child is dependent and (2) whether clear and convincing *397 evidence establishes that no viable alternatives to the termination of parental rights exist. See K.N.F.G. v. Lee Cty. Dep't of Human Res., 983 So.2d 1108, 1115 (Ala. Civ. App. 2007).
I. The Mother's Appeals
a. Dependency
To support a finding of dependency in a termination-of-parental-rights action, the juvenile court must find that grounds for terminating parental rights exist under § 12-15-319(a), Ala. Code 1975. See K.N.F.G., 983 So.2d at 1115. The mother first argues that the juvenile court erred in terminating her parental rights because, she says, she had adjusted her circumstances to meet the needs of the children. When DHR removed the children from the custody of the mother and the father in November 2012, DHR's concerns regarding the mother were her habitual substance abuse and her failure to protect the children from being abused by the father. The evidence at trial tended to prove that the mother had refrained from the illegal use of drugs since August 2013 and that she had participated in a program for victims of domestic violence in Alaska, which presumably had taught her how to protect the children from physical abuse. However, the juvenile court reasonably could have been clearly convinced by the evidence before it that, in September 2013, the mother, on her own initiative and without any suggestion by DHR that she do so, had moved to Alaska, which was approximately 4,000 miles away from the children, and that she had failed to maintain meaningful contact with the children thereafter. Although the mother initially testified that DHR had told her to move to Alaska, her testimony on cross-examination indicated that she had moved to Alaska because she needed the emotional support of her sister, T.O., who lived in Alaska. Webb denied that she had told the mother to move to either Alaska or Mississippi, and the juvenile court, as the sole judge of the facts and of the credibility of the witnesses, see Woods v. Woods, 653 So.2d 312, 314 (Ala. Civ. App. 1994) ("In ore tenus proceedings, the trial court is the sole judge of the facts and of the credibility of witnesses, and the trial court should accept only that testimony it considers to be worthy of belief."), could have found that Webb's testimony was credible and that the mother's testimony was not credible insofar as she claimed that DHR had told her to move to Alaska. Moreover, it is undisputed that the mother was still living in Alaska of her own accord when the actions were tried in January 2017, over three years after she had moved there in September 2013. The juvenile court, as the sole judge of the facts and of the credibility of the witnesses, reasonably could have found that, during the period she had lived in Alaska, the mother, of her own volition, had failed to maintain meaningful contact with the children, especially the three youngest children. Indeed, she admitted that she no longer knew the three youngest children. Although the evidence indicates that the mother may have had more contact with the oldest child than she had with the three youngest children, the juvenile court reasonably could have inferred, from the maternal great-aunt's testimony that she had seen the mother only three times since 2014, from Welch's testimony that the oldest child did not begin living with the maternal great-uncle and great-aunt until December 2015, and from the testimony of several witnesses that the oldest child vacillates regarding whether he wants to see the mother, that the mother's contact and communication with the oldest child was not consistent.
Section 12-15-319(a)(11), Ala. Code 1975, provides that one of the factors to be *398 considered by a juvenile court in determining whether grounds for terminating parental rights exist is the "[f]ailure by the parents to maintain consistent contact or communication with the child." The juvenile court reasonably could have been clearly convinced from the evidence before it that DHR had established the existence of that factor.
Moreover, § 12-15-319(a)(1), Ala. Code 1975, provides that another factor a juvenile court may consider in determining whether grounds for terminating parental rights exist is whether "the parents have abandoned the child, provided that in these cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents." Section 12-15-301(1), Ala. Code 1975, defines "abandonment" as
"[a] voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
(Emphasis added.) The record contains ample evidence establishing that the mother had voluntarily and intentionally "withh[eld] from the child[ren], without good cause or excuse, ... her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection" during the years she lived in Alaska. Although the juvenile court did not make an express finding that the mother had abandoned the children, it is well settled that, subject to exceptions not here applicable, "[an appellate court] will affirm the trial court on any valid legal ground presented by the record, regardless of whether that ground was considered, or even if it was rejected, by the trial court." Liberty Nat'l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1020 (Ala. 2003). Accordingly, we reject the mother's argument that the juvenile court erred in finding that grounds for terminating her parental rights existed.
b. Reasonable Efforts by DHR to Reunite the Mother with the Children
The mother next argues that DHR did not make reasonable efforts to reunite her with the children. However, § 12-15-319(a)(1) provides that, when a parent has abandoned his or her child, "proof shall not be required of reasonable efforts to ... reunite the child with the parent[ ]." Therefore, because the record contains ample evidence establishing that the mother abandoned the children, we cannot reverse the juvenile court's judgments insofar as they terminated the mother's parental rights based on her argument that DHR failed to make reasonable efforts to reunite her with the children.
c. Viable Alternatives
The mother also argues that the juvenile court erred in terminating her parental rights because, she says, viable alternatives to the termination of her parental rights existed. However, "[w]hen a mother abandons her child[ren] and no longer maintains a significant parental relationship with her child[ren], she loses her right to compel the state to exhaust viable alternatives before terminating her parental rights." C.F. v. State Dep't of Human Res., 218 So.3d 1246, 1251 (Ala. Civ. App. 2016) (citing C.C. v. L.J., 176 So.3d 208 (Ala. Civ. App. 2015) ). Therefore, we cannot reverse the juvenile court's judgments insofar as they terminated the mother's *399 parental rights based on the mother's viable-alternatives argument.
d. Evidentiary Issues
The mother argues that the juvenile court erred in admitting certain testimony and exhibits into evidence. Our recitation of the pertinent evidence above did not rely on any of the evidence that the mother argues was erroneously admitted, even though some of her evidentiary arguments are not meritorious. We were able to do that because other evidence, which the mother has not challenged on appeal, was admitted that established the same pertinent facts and inferences as the evidence she has challenged on appeal. See Ex parte Bush, 474 So.2d 168, 171 (Ala. 1985) ("[T]estimony apparently illegal upon admission may be rendered prejudicially innocuous by subsequent legal testimony to the same effect or from which the same facts can be inferred."). Therefore, any error the juvenile court may have committed in admitting the evidence the mother has challenged on appeal was harmless. "No judgment may be reversed or set aside, nor new trial granted in any civil ... case on the ground of ... the improper admission ... of evidence ... unless in the opinion of the court to which the appeal is taken ..., after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties." Rule 45, Ala. R. App. P. Therefore, we cannot reverse the judgments of the juvenile court insofar as they terminated the mother's parental rights based on her evidentiary arguments.
II. The Father's Appeals
a. Dependency
The father argues that the juvenile court erred in terminating his parental rights because, he says, the evidence established that he was fully rehabilitated and that he was fully capable of discharging his obligations to and for the children. Specifically, the father argues that DHR failed to prove that he had physically abused the mother since 2012, that DHR had failed to prove that he had ever physically abused the children, that he had completed all the classes and programs required by DHR as a condition of his being reunited with the children, that he was no longer using illegal drugs, and that the juvenile court's decision whether to terminate his parental rights must be based on his current conduct and circumstances rather than his conduct and circumstances when DHR removed the children from his and the mother's custody.
The evidence established that the father had physically abused the mother in August 2013 and that he had been arrested for doing so in August 2013. It further established that he did not have the opportunity to abuse her thereafter because she left Alabama before he was released from jail in mid-October 2013. The mother's testimony also established that the father had abused the children. Moreover, it can be inferred from the hostility, aggressiveness, and propensity to engage in violence exhibited by the children that they had been physically abused by the father on a regular basis. Likewise, it can be inferred from the evidence indicating that the children are afraid of the father and do not want to have any contact with him that he physically abused the children. Furthermore, the evidence established that the father has not had the opportunity to abuse the children since November 2012 because his visits with them were supervised. Although the father's girlfriend testified that the children were happy to see the father when he visited them at the August 2016 ISP meeting and that he had not abused her, the juvenile court, as the sole judge of *400 the facts and of the credibility of the witnesses, could have found that her testimony was not credible. Likewise, although the father testified that he had completed a domestic-violence-intervention program in another county, he did not introduce any corroborating evidence, and the juvenile court could have found that his testimony was not credible. The juvenile court could have inferred from the children's hostility, aggressiveness, propensity to engage in violence, and fear of the father that the father's physically abusing the children had harmed them psychologically, that they were still suffering psychologically from that abuse, and that reuniting the children with their abuser would inflict additional psychological harm on them. This court has stated:
" 'This court has consistently held that the existence of evidence of current conditions or conduct relating to a parent's inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.' D.O. v. Calhoun Cty. Dep't of Human Res., 859 So.2d 439, 444 (Ala. Civ. App. 2003). However, ' "[i]n deciding to terminate parental rights, a trial court may consider the past history of the family as well as the evidence pertaining to current conditions." ' A.R. v. State Dep't of Human Res., 992 So.2d 748, 760 (Ala. Civ. App. 2008) (quoting T.B. v. Lauderdale Cty. Dep't of Human Res., 920 So.2d 565, 570 (Ala. Civ. App. 2005) )."
C.P. v. Cullman Cty. Dep't of Human Res., 203 So.3d 1261, 1269 (Ala. Civ. App. 2016) (second emphasis added). We conclude that the juvenile court could properly have found that, because of the father's history of physically abusing the children, which had traumatized the children and justifiably caused them to fear him, the father was unable to care for the children and that his inability to care for them was unlikely to change in the foreseeable future.
b. Viable Alternatives
The father argues that the juvenile court erred in terminating his parental rights because, he says, DHR did not adequately explore the availability of relative resources. We disagree. The record contains evidence from which the juvenile court reasonably could have been clearly convinced that DHR had adequately explored relative resources and had found that the only suitable relative resources available were the maternal great-uncle and great-aunt, who could care for only one of the children because of the propensity of the children to fight with each other when they were together. Moreover, the mere existence of a relative resource does not obligate a juvenile court to find that the temporary placement of children with that relative resource is a viable alternative to the termination of parental rights. See D.V. v. Colbert Cty. Dep't of Human Res., 121 So.3d 370, 379 (Ala. Civ. App. 2012) (" 'Although a juvenile court is required to consider alternatives to termination under Ex parte Beasley, 564 So.2d [950] at 954 [ (Ala. 1990) ], the juvenile court is not required to accept any suggested alternative as "viable" simply because it exists.' " (quoting J.A. v. Etowah Cty. Dep't of Human Res., 12 So.3d 1245, 1254 (Ala. Civ. App. 2009) )). Whether a viable alternative exists in a given case is a question of fact, and the ore tenus rule governs our review of a juvenile court's determination regarding that issue. See D.V. In the present case, the juvenile court reasonably could have been clearly convinced that, because the father's physical abuse of the children had so traumatized them that any alternative to terminating his parental rights would cause the children *401 to suffer psychologically, if not physically, in the future, no viable alternative to termination of his parental rights existed.
Conclusion
For the reasons discussed above, we affirm the juvenile court's judgments terminating the mother's and the father's parental rights to their children.
2160359, 2160360, 2160361, and 2160362-AFFIRMED.
2160374, 2160375, 2160376, and 2160377-AFFIRMED.
Thompson, P.J., and Thomas, Moore, and Donaldson, JJ., concur.