Rel: November 1, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

## CL-2024-0430

_____

## A.D.J.

### v.

## Mobile County Department of Human Resources

### Appeal from Mobile Juvenile Court
### (JU-21-1185.02)

MOORE, Presiding Judge.

A.D.J. ("the father") appeals from a judgment entered on April 24, 2024, by the Mobile Juvenile Court ("the juvenile court"), terminating his parental rights to B.J. ("the child"). We affirm the judgment.

### The Judgment

Upon finding in its judgment that the father had abandoned the child, the juvenile court terminated the father's parental rights on the

ground that he was unable or unwilling to discharge his parental responsibilities to and for the child. See Ala. Code 1975, § 12-15-319. The judgment recounts that the child was born in 2012, during the marriage of the father and L.F. ("the mother"). Later in 2012, the mother and the father divorced; the divorce judgment failed to mention the child but, in 2013, the divorce judgment was amended to adjudicate the father's legal paternity of the child. Despite the knowledge of his legal paternity, the father never established a parental relationship with the child, having seen the child only four times between 2012 and 2021. In August 2021, the mother surrendered custody of the child to the Mobile County Department of Human Resources ("DHR"), informing DHR that she could no longer care for the child. The father saw the child only twice after the child was placed into foster care -- on February 14, 2024, following genetic testing that confirmed his paternity, and on April 17, 2024, the day of the termination-of-parental-rights trial.

Despite finding that the father had abandoned the child, the juvenile court found that DHR had used reasonable efforts to rehabilitate the father but that the father had failed to avail himself of any services

2

or to meaningfully participate in visitation, having talked to the child on the telephone only four times after February 14, 2024. The juvenile court also determined that there were no viable alternatives to the termination of the father's parental rights. The child testified at trial and expressed some interest in getting to know the father, but the child ultimately said that he wanted to be adopted by his foster parent, which the juvenile court concluded was in the child's best interests.

## Issues

On appeal, the father raises several arguments that are premised on the alleged error of the juvenile court in determining that he abandoned the child. His remaining arguments are either disposed of by our disposition of the abandonment issue or are undeveloped.

## Standard of Review

A judgment terminating parental rights must be supported by clear and convincing evidence, which is "'"[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion."'" C.O. v. Jefferson

Cnty. Dep't of Hum. Res., 206 So. 3d 621, 627 (Ala. Civ. App. 2016)

(quoting L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting

in turn Ala. Code 1975, § 6-11-20(b)(4)).

> "'[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly ... establish the fact sought to be proved.'
>
> "KGS Steel[, Inc. v. McInish,] 47 So. 3d [749] at 761 [(Ala. Civ. App. 2006)].
>
> "... [F]or trial courts ruling on motions for a summary judgment in civil cases to which a clear-and-convincing-evidence standard of proof applies, 'the judge must view the evidence presented through the prism of the substantive evidentiary burden[,]' [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986)]; thus, the appellate court must also look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would 'produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion.' § 25-5-81(c)[, Ala. Code 1975]."

Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008). This court does not

reweigh the evidence but, rather, determines whether the findings of fact

made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id. We review the legal conclusions to be drawn from the evidence without a presumption of correctness. J.W. v. C.B., 68 So. 3d 878, 879 (Ala. Civ. App. 2011).

Discussion

For the purpose of terminating of parental rights, "abandonment" refers to

> "[a] voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."

Ala. Code 1975, § 12-15-301(1). As the father recognizes in his brief to this court, "abandonment occurs when a parent intentionally forsakes their parental responsibilities without justifiable cause." The father's brief, p. 11; see also C.C. v. L.J., 176 So. 3d 208, 211 (Ala. Civ. App. 2015). Whether a parent has abandoned a child is a question of fact for the

5

juvenile court to determine based on its assessment of the competing evidence, and a finding of abandonment will not be set aside if it is supported by clear and convincing evidence. See A.D. v. R.P., 345 So. 3d 657, 668 (Ala. Civ. App. 2021).

In this case, the juvenile court received sufficient evidence from which it reasonably could have been clearly convinced that, from the time the child was born, the father had withheld from the child his presence, care, love, protection, and the opportunity for the display of filial affection. Although the father did pay child support for the child between 2016 and December 2023, by his own admission the father intentionally avoided any interpersonal relationship with the child from 2012 to 2024, having seen the child only a few times. The payment of child support alone does not preclude a juvenile court from finding that a parent has abandoned a child. See A.E. v. M.C., 100 So. 3d 587, 598 (Ala. Civ. App. 2012) ("Although 'maintenance,' i.e., support, is one of many factors to consider in determining whether a parent has abandoned a child, it is clear that failing to be present and act as a parent is equally significant.").

The father asserts, however, that he had "good cause or excuse" for his absence from the child's life because, he says, he was uncertain as to his paternity of the child until February 2024, when genetic testing that was conducted as part of the termination-of-parental-rights proceeding established that he was the biological father of the child. When the child was born in 2012, the father was married to the mother, making him the legal father of the child regardless of his biological paternity. See Ala. Code 1975, § 26-17-204(a)(1), and Ex parte Presse, 554 So. 2d 406 (Ala. 1989). The father nevertheless testified that he had doubted his biological paternity of the child because he and the mother had been separated during the period leading up to the child's birth and they had divorced shortly thereafter, making no provision for the child in their uncontested divorce judgment. The father testified that he had not undergone any genetic testing to determine his parentage of the child in the years following the entry of the divorce judgment. Without genetic testing proving his biological link to the child, the father decided not to forge a parental relationship with the child because, he said, he did not

7

want to parent the child only to later find out that the child was not his biological child.

On cross-examination, the father admitted that he had understood that he was the legal father of the child since at least 2013. On May 6, 2013, in postdivorce proceedings, the divorce judgment was amended to declare the father to be the legal father of the child. The father testified that, during hearings in the postdivorce proceedings, the judge had explained to him that, regardless of whether genetic testing showed that he was not the biological father of the child, he was the legal father of the child with a responsibility to support the child. The father acknowledged that the amended divorce judgment required him to pay child support for the benefit of the child, which, he said, he started paying in 2016.

The father claimed that he had requested genetic testing during the postdivorce proceedings but that his request had been denied. The father also asserted that he had repeatedly requested genetic testing every time he had appeared in court after 2013, but the father did not provide any documentary evidence of any such request. On November 17, 2023, the father requested genetic testing as part of the termination-of-parental-

8

rights proceeding. When asked why he had allowed 12 years to pass before formally requesting genetic testing, the father simply responded: "The time passed ...."

Because the 2013 amended divorce judgment clearly informed the father that he was the legal father of the child, see Ala. Code 1975, § 26-17-201(b)(3) (providing that a legal father-child relationship may be established by adjudication), the juvenile court impliedly determined that the father did not have a good excuse for failing to parent the child. The juvenile court evidently concluded that the father's alleged uncertainty as to his biological parentage of the child was not a sufficient reason to excuse the father's behavior toward the child following the declaration of his legal paternity. The father argues that the juvenile court erred in that respect.

In his brief, the father states, in pertinent part:

> "The critical factor is the delayed confirmation of [the father's] paternity. Until the court-ordered [genetic] test confirmed his paternity in February 2024, ... [the father] lacked legal certainty about his role as the child's father. Without this confirmation, it would have been inappropriate for [the father] to assert parental rights or responsibilities,

and his limited engagement was justifiable given the legal ambiguity.

> "This reasoning aligns with Alabama's ruling in <u>Ex parte J.W.B.</u>, 933 So. 2d 1081, 1085 (Ala. 2005), where the [supreme] court recognized that delays in confirming paternity must be considered when evaluating a parent's actions. Similarly, other courts have found that delays in confirming paternity can mitigate findings of abandonment. For example, the District of Columbia Court of Appeals in <u>In re B.A.S.</u>, 880 A.2d 1003, 1011 (D.C. 2005), recognized that delays in confirming paternity and logistical issues should be considered when determining abandonment. The Nebraska Supreme Court also ruled in <u>In re Interest of Z.S.</u>, 761 N.W.2d 238, 244-45 (Neb. 2009), that a father's delay in asserting parental rights could not be equated with abandonment when paternity was uncertain."

The father's brief, p. 12. We reject this argument.

When a man is the legal father of a child, the law does not require evidence of genetic testing to support an adjudication of paternity. In those circumstances, evidence of genetic testing may be admitted to disprove paternity but that evidence is not necessary to prove paternity. <u>See</u> Ala. Code 1975, § 26-17-631(1). As explained above, under Alabama law, the father was the legal father of the child when the child was born in 2012 based on his marriage to the mother. The 2013 amended divorce judgment further erased any doubt as to the father's legal status as the

10

child's father, despite the absence of evidence of genetic testing. Thus, there was no "legal ambiguity" that prevented the father from asserting his legal rights and accepting his legal responsibilities toward the child. The father clearly understood that he was bound by the paternity adjudication despite the absence of evidence of genetic testing because, as he testified, he realized that, based on the 2013 amended divorce judgment, he was obligated to pay child support for the benefit of the child.

Ex parte J.W.B., 933 So. 2d 1081 (Ala. 2005), the lone case cited by the father to support his argument,[1] bolsters the judgment of the juvenile court. In J.W.B., an unwed father, who was considered a putative father for adoption purposes, see A.D.S. v. S.J.L., 70 So. 3d 345, 350 (Ala. Civ. App. 2010), asserted that he had good reason for failing to parent his child because, among other things, he was not certain of his paternity

---

[1]The foreign-jurisdiction cases upon which the father relies could not be located. The citations lead to Anderton v. WasteAway Services, LLC, 880 A.2d 1003 (Conn. App. Ct. 2005), a workers' compensation case, and Michigan Education Association v. Secretary of State, 761 N.W.2d 234, 243 (Mich. Ct. App. 2008), a declaratory-judgment case.

until genetic testing conducted several weeks after the birth of the child excluded another man from being the child's father, and, in the meantime, the maternal family had seized on that uncertainty to prevent him from seeing the child. The Madison Probate Court rejected those excuses, concluding that the weight of the evidence showed that the putative father had not been prevented from seeing the child by the maternal family and that, in fact, he had been disinterested in forming a parental relationship with his child. The supreme court affirmed the probate court's determination that the putative father had unjustifiably failed to form a significant relationship with his child, thereby impliedly consenting to his adoption. J.W.B. holds that a trial court may find that a lack of definitive scientific proof of paternity is not a sufficient excuse for a putative father to avoid his parental responsibilities to and for his child. In this case, the juvenile court likewise found that the father was not justified in refusing to form a significant parental relationship with the child based on the lack of genetic testing confirming his paternity.

Furthermore, the father was the legal father of the child, not a putative father, which makes his excuse even less credible. In In re

Chance J., 279 Neb. 81, 776 N.W.2d 519 (2009), the Nebraska Supreme Court affirmed a judgment terminating the parental rights of a legal father based on facts remarkably similar to the facts in this case. In 2002, Andrew J. was married to Miranda J. when she gave birth to Chance J., making Andrew the legal father of Chance; however, Andrew doubted his biological paternity because he had been separated from Miranda before the time of Chance's birth, Chance did not physically resemble him, and Miranda had remarked that Chance may be another man's child. Based on his uncertainty, Andrew refused to act as a father toward Chance. In April 2008, after Nebraska authorities filed a petition to terminate his parental rights, Andrew obtained genetic testing, the results of which proved that Chance was his biological child and, at that point, he expressed interest in acting as a father to Chance. A Nebraska juvenile court concluded that Andrew had abandoned Chance and terminated his parental rights.

On appeal, the Nebraska Supreme Court held that the undisputed facts showed that Andrew had intentionally refused to act as a parent toward Chance since his birth.

13

"Given these undisputed facts, the question before us is whether Andrew had just cause or excuse to withhold his presence, care, love, protection, maintenance, and the opportunity for the display of parental affection of Chance. Andrew argues that he had just cause or excuse, because prior to genetic testing, he believed that he was not Chance's father."

279 Neb. at 90, 776 N.W.2d at 526. The Nebraska Supreme Court rejected that argument, concluding that Andrew's "paternal uncertainty" did not justify his abandonment of Chance, who was "born into wedlock." 279 Neb. at 91, 776 N.W.2d at 527. The court considered that Andrew had made no effort to obtain genetic testing to confirm his suspicions that he was not Chance's biological father until after termination proceedings were commenced. The court held that Andrew could not avoid his parental obligations to Chance "that easily." Id.

In this case, the father alleged that he had repeatedly requested genetic testing to confirm his suspicion that the child was not his biological child. Because no records were presented to support those allegations, the juvenile court was not required to believe the father; however, even if the father had made the requests as he testified, the failure of the father to obtain the genetic testing until 2024 does not

14

excuse his abandonment of the child. The child was born in wedlock, and the 2013 paternity adjudication confirmed the father's legal relationship to the child. Alabama law allows a trial court to reopen a paternity adjudication "if there is scientific evidence presented by the defendant that he is not the father." Ala. Code, 1975, § 26-17A-1(a). The father did not obtain that evidence and seek to have the 2013 amended divorce judgment set aside; therefore, he could not disregard the 2013 amended divorce judgment and deny his paternity and the rights and responsibilities arising therefrom. The father contends that his subjective belief that the child might not have been his biological child was sufficient to excuse his behavior toward the child, but a legal father cannot avoid his parental duties so easily. Thus, the juvenile court correctly determined that the father had no "good cause or excuse" to withhold his emotional support from the child.

The father also asserts that, after genetic testing proved his biological paternity of the child, he made reasonable efforts to establish a relationship with the child, which, he says, were hampered by "logistical barriers and [DHR]'s failure to provide sufficient support." The

father's brief, p. 13. In effect, the father argues that the juvenile court should not have concluded that he had abandoned the child because he was willing to act as a parent toward the child. That argument is meritless.

After the mother surrendered custody of the child to DHR in August 2021, DHR placed the child with D.N. ("the foster parent"), a friend of the mother's. The child bonded with the foster parent. On April 15, 2022, after DHR learned of the father's paternity, it conducted an individualized-service-plan ("ISP") meeting, at which the father agreed to submit to a psychological evaluation, to complete parenting classes, and to attend supervised visits with the child. The father did not accomplish any of those tasks, because, as he testified, he would not have been able to care for the child anyway. The father did not maintain contact with DHR after the April 2022 ISP meeting. Thereafter, DHR instituted a permanency plan calling for the termination of the father's parental rights and adoption by the foster parent.

Due to the lack of his efforts to cooperate with DHR and to satisfy the goals of the ISP, the father did not see the child until the date of the

16

genetic testing. After the genetic testing, the father spent five minutes with the child eating ice cream at a local McDonald's fast-food restaurant. The father also shared five telephone conversations with the child leading up to the April 17, 2024, trial date. Throughout the day of the trial, the father visited with the child. The child testified that, even after those contacts, he did not really know the father. The father admitted that he still had no significant parental relationship with the child when he testified that he wanted to forestall termination of his parental rights to "build a relationship with [the child] and get to know him." The child expressed a willingness to get to know the father, but he maintained that he wanted to be adopted by the foster parent.

In A.E. v. M.C., supra, a legal father had abandoned his child following an adjudication of his paternity, allowing his child to be raised by the mother and, after the mother died, by the mother's relatives. When his child was six years old, the legal father filed a petition to gain custody of the child, and the custodians of his child countered by filing a dependency petition. The legal father exercised visitation with the child while those petitions were pending. The Marshall Juvenile Court denied

17

the dependency petition and awarded the father custody of his child. This court reversed the judgment, concluding that the legal father had not cured his abandonment of his child by filing a custody action and exercising pendente lite visitation. This court explained that, because the legal father had abandoned his child, his child had bonded with the custodians, whom she viewed as her parental figures, and that removing her from their custody would cause her psychological harm. This court held: "We cannot conclude that, under these facts, the father's stated willingness to appear in the child's life and serve in a parental role diminished or erased his abandonment of her for the vast majority of her life." 100 So. 3d at 598. A.E. was a dependency case, but it applied the same definition of "abandonment" as applies in termination-of-parental-rights cases. See § 12-15-301(1). The reasoning in A.E. supports the juvenile court's determination in this case. The father could not negate his abandonment of the child for over 12 years by attempting to form a parental relationship with the child in the 2 months leading up to the trial and asserting that he was ready to act as a concerned parent toward the child. By that time, the child had been residing with the foster parent

18

for over two years, had bonded with the foster parent, and had decided that he wanted to be adopted by the foster parent. Under those circumstances, we conclude that the juvenile court did not err in finding that the father had abandoned the child despite his contacts with the child during 2024.

The father argues that DHR did not use reasonable efforts to reunite him with the child and that the juvenile court did not fully consider other viable alternatives to the termination of his parental rights.

> "Because we have determined that the juvenile court's abandonment finding is supported by the evidence, we need not consider the father's other arguments, including that [the Department of Human Resources] failed to make reasonable efforts to rehabilitate him and that [the Department of Human Resources] did not establish that no viable alternative to the termination of his parental rights existed. Once a parent has abandoned a child, [the Department of Human Resources] is not required to make reasonable efforts to rehabilitate that parent. See [Ala. Code 1975,] § 12-15-319(a)(1); L.L. v. J.W., 195 So. 3d 269, 273 (Ala. Civ. App. 2015) ('[I]n cases of abandonment, a juvenile court can terminate parental rights even in the absence of proof that the state has used reasonable effort to rehabilitate the parent and reunite the family ....'). Furthermore, once a parent has been found to have abandoned a child, the juvenile court is not required to consider whether a viable alternative to the

19

> termination of his or her parental rights exists. See C.F. v. State Dep't of Hum. Res., 218 So. 3d 1246, 1251 (Ala. Civ. App. 2016) (stating that, '[w]hen a [parent] abandons [his or her] child and no longer maintains a significant parental relationship with [his or] her child, [he or] she loses [the] right to compel the state to exhaust viable alternatives before terminating [his or] her parental rights'); see G.S. v. Cullman Cnty. Dep't of Hum. Res., 253 So. 3d 383, 398 (Ala. Civ. App. 2017)."

K.F. v. Millwood, [Ms. CL-2023-0393, Feb. 23, 2024] ___ So. 3d ___, ___ (Ala. Civ. App. 2024). The fact that the juvenile court made superfluous findings regarding reasonable efforts and viable alternatives does not require this court to review the evidence to sustain those findings. See T.B. v. Lee Cnty. Dep't of Hum. Res., 216 So. 3d 1246, 1253 (Ala. Civ. App. 2016).

Finally, the father raises an argument that the judgment terminating his parental rights does not serve the child's best interests. He does not, however, develop that argument; instead, he focuses on the alleged absence of viable alternatives. See J.D. v. E.R., 266 So. 3d 1088, 1099 (Ala. Civ. App. 2018) ("We will not reverse the juvenile court's judgments on an undeveloped and unsupported argument."). Nevertheless, we conclude that the juvenile court received more than

sufficient evidence indicating that the best interests of the child would be served by the termination of the father's parental rights. The mother, who had raised the child since his birth, was unable or unwilling to parent the child and consented to the termination of her parental rights. The child had been securely residing with the foster parent in a stable, custodial arrangement since 2021. DHR had determined that the foster parent was providing the child a suitable home and that the child would be best served by remaining there. The juvenile court reasonably could have been clearly convinced that the stability and permanency interests of the child would be served by terminating the father's parental rights to allow the child to be adopted by the foster parent. See C.S. v. Mobile Cnty. Dep't of Hum. Res., 166 So. 3d 680, 686 (Ala. Civ. App. 2014).

Conclusion

Based on the foregoing, the judgment entered by the juvenile court terminating the father's parental rights to the child is affirmed.

AFFIRMED.

Edwards, Hanson, Fridy, and Lewis, JJ., concur.