Rel: July 26, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2024

————————————————

## CL-2023-0524

————————————————

## Ex parte Madison County Department of Human Resources

## PETITION FOR WRIT OF MANDAMUS

## (In re: In the matter of D.W.)

## (Madison Juvenile Court:  JU-21-454.02)

————————————————

## CL-2023-0553

————————————————

## O.W.

## v.

## J.B. and K.B.

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

_____

**CL-2023-0555**

_____

**Madison County Department of Human Resources**

**v.**

**J.B. and K.B.**

_____

**CL-2023-0560**

_____

**R.N.**

**v.**

**J.B. and K.B.**

**Appeals from Madison Juvenile Court**
**(JU-21-454.02)**

EDWARDS, Judge.

In February 2023, the Madison County Department of Human Resources ("DHR") filed in the Madison Juvenile Court ("the juvenile court") a petition seeking to terminate the parental rights of O.W. ("the father") and R.N. ("the mother") to D.W. ("the child"). In April 2023, the juvenile court set the termination-of-parental-rights action for a trial to

2

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

be held on June 26, 2023, at 9:00 a.m. On May 1, 2023, the foster parents of the child, J.B. and K.B. ("the foster parents"), filed, pursuant to Rule 24, Ala. R. Civ. P., a motion to intervene in the termination-of-parental-rights action; the foster parents did not file a "pleading setting forth the claim or defense for which intervention is sought," see Rule 24, with their motion to intervene. No party filed an objection to the motion to intervene, and the juvenile court, after a holding a hearing on the motion, entered an order on May 18, 2023, allowing the foster parents to intervene.

On June 6, 2023, a cousin of the child, A.E. ("the cousin"), filed a motion to intervene, which the juvenile court set for a hearing that was ultimately held on June 16, 2023. The cousin's motion, which was verified, contained averments stating that she was a first cousin once removed of the child, describing her relationship to the child, stating that she served as a placement for one of the child's siblings, and describing the child's relationship with that sibling; she requested that she be granted permanent placement of the child. The foster parents filed an objection to the cousin's intervention, in which they challenged the

3

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

tardiness of the cousin's attempt to obtain placement of the child and the fact that, as a first cousin once removed from the child, she was not a "relative" of the child as defined in Ala. Code 1975, § 12-15-301(14), because she was not within the fourth degree of kinship.[1] The juvenile court denied the cousin's motion to intervene on June 21, 2023.

On June 21, 2023, the father filed what he styled as a "motion to dismiss" DHR's petition to terminate his parental rights. In his motion, the father averred that he had completed services required by DHR, that he was currently exercising unsupervised visitation with the child, and that he had stable housing and employment. On the same day, the foster parents, relying on Ala. Code 1975, § 12-15-312(c), filed a motion seeking to have DHR relieved of making reasonable efforts toward the rehabilitation of the mother and of the father.

---

[1]The term "relative" is defined in § 12-15-301(14) as:

"An individual who is legally related to the child by blood, marriage, or adoption within the fourth degree of kinship, including only a brother, sister, uncle, aunt, first cousin, grandparent, great grandparent, great-aunt, great-uncle, great great grandparent, niece, nephew, grandniece, grandnephew, or a stepparent."

4

On June 22, 2023, DHR filed a motion to continue the termination-of-parental-rights trial. In that motion, DHR asserted that it was currently assessing the father's completion of the services that it had required and that it was moving toward granting the father unsupervised visitation with the child. The motion also stated that DHR desired to explore the cousin as a potential relative resource. On that same day, DHR also filed a response to the foster parents' motion to have DHR relieved of reasonable efforts. In that response, DHR objected to the foster parents' motion and indicated that the father had made substantial progress, that it had filed a motion to continue the termination-of-parental-rights trial, and that it planned to continue, not cease, reunification efforts.

On June 26, 2023, at 6:02 a.m., almost three hours before the scheduled start of the trial, DHR filed a "motion to strike the foster parents as intervenors." In that motion, DHR alleged that the foster parents had interfered with the services offered, and the reunification efforts that had been made, by DHR. Specifically, DHR averred that the foster parents had refused to comply with DHR's directive that the child

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

be taken to appointments with his therapist on more than one occasion, that the foster parents had failed to make the child available for an April 7, 2023, visit, and that the foster parents had failed to make the child available for a visit with the father that had been scheduled for June 24, 2023, despite the child's having attended a visit with his siblings the previous day. DHR attached to the motion e-mail correspondence between the foster mother, K.B. ("the foster mother"), counsel for the foster parents, and Megan Scott, the DHR caseworker assigned to the child, in which the foster mother stated that she had

> "not plan[ned] on responding to [the caseworker's e-mail] until at least Sunday night or Monday morning but I wanted to let you know that [the child] tested POSITIVE for strep throat and his only symptom [sic] is redness in the back of the throat and grumpiness (but that could honestly just be from visit with [the mother] and siblings on Friday). The Lord is clearly working!"

(Capitalization in original.)

On June 26, 2023, at 8:32 a.m., DHR filed in the juvenile court what it styled as a "Motion/Notice to Voluntary [sic] Dismiss [DHR's] Petition Pursuant to Rule 41[, Ala. R. Civ. P.,] in the Alternative [sic] the Court Denies [DHR's] Motion to Continue." Shortly thereafter, the foster

6

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

parents filed what they styled as a "Brief on the Doctrine of 'Last-Minute Efforts.'" The trial commenced at 9:39 a.m. on June 26, 2023. At that time, the juvenile court orally denied DHR's motion to continue and its motion to voluntarily dismiss the termination-of-parental-rights action; however, it permitted DHR to withdraw its petition to terminate the parental rights of the father and of the mother and allowed DHR's counsel to be relieved from participating in the trial. The juvenile court opined that the foster parents, who had intervened, had also sought to "join in" DHR's petition to terminate parental rights, and it permitted the foster parents to litigate the termination-of-parental-rights action over DHR's objection. Counsel for DHR did not further participate in the litigation of the termination-of-parental-rights action.

During the second day of the two-day trial, the juvenile court indicated that it might require a licensed child-placing agency as an option for placement in the event that it terminated the parental rights of the father and of the mother. After the lunch break on that day, the following exchange occurred between the juvenile court and counsel for the foster parents:

7

"THE COURT: Were y'all able to contact a licensed child-placing agency in the event I get that far? Because DHR has withdrawn.

"[COUNSEL FOR THE FOSTER PARENTS]: Yes, Your Honor, we have secured an agreement with a licensed child-placing agency by the name of Kids to Love.

"THE COURT: Okay.

"[COUNSEL FOR THE FOSTER PARENTS]: And they [sic] are willing to receive custody I think that if the Court gets there, I think it would probably be appropriate if there was an order that the child stay placed in the [foster parents'] home. I think I have other things to say on that topic --

"THE COURT: Sure.

"[COUNSEL FOR THE FOSTER PARENTS]: -- but I think the direct question [sic] was, yes, we have secured an agreement for a licensed child-placing agency.

"….

"THE COURT: … I have a licensed child-placing agency who is willing to receive the permanent custody of the child."

No party made any objection to the above colloquy between counsel for the foster parents and the juvenile court.

After the conclusion of the trial, the juvenile court entered a judgment on July 12, 2023, terminating the parental rights of the father and of the mother. In the July 12, 2023, judgment, the juvenile court

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

awarded permanent custody of the child to Kids to Love and directed that the child was to remain in the home of the foster parents. The July 12, 2023, judgment also specifically relieved DHR of the temporary legal custody of the child and remarked that DHR "had abandoned the child in litigation." On July 24, 2023, DHR filed a postjudgment motion and a motion to stay the July 12, 2023, judgment.[2] The father filed a postjudgment motion and a notice of appeal on July 25, 2023; the mother filed a postjudgment motion and a notice of appeal on July 26, 2023. The notices of appeal filed by the father and the mother were held in abeyance until the denial of all pending postjudgment motions. See Rule 1(B), Ala. R. Juv. P.; Rule 4(a)(5), Ala. R. App. P. ("A notice of appeal filed after the entry of the judgment but before the disposition of all post-judgment motions filed pursuant to Rules 50, 52, 55, and 59, Alabama Rules of Civil Procedure, shall be held in abeyance until all post-judgment motions filed pursuant to Rules 50, 52, 55, and 59 are ruled upon ...."). The juvenile court entered a single order denying all pending postjudgment motions

_____

[2]Because DHR had been the child's legal custodian, it had the right to seek postjudgment review of the juvenile court's decision to terminate its status as legal custodian of the child.

9

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

on August 3, 2023, and the notices of appeal filed by the father and the mother became effective on that date. Id. (providing that a notice of appeal filed before the resolution of postjudgment motions "shall become effective upon the date of disposition of the last of all such motions"). The father's appeal was docketed as appeal number CL-2023-0553; the mother's appeal was docketed as appeal number CL-2023-0560.

On July 25, 2023, DHR filed with this court a petition for the writ of mandamus and a motion to stay. The petition for the writ of mandamus was docketed as case number CL-2023-0524. On August 8, 2023, DHR filed a notice of appeal from the termination-of-parental rights judgment. DHR's appeal was docketed as appeal number CL-2023-0555. We consolidated the petition for the writ of mandamus and all three appeals. In addition, we granted DHR's motion to stay the July 12, 2023, judgment.

I. CL-2023-0524 -- DHR's Petition for the Writ of Mandamus

In its petition for the writ of mandamus, DHR argues that the juvenile court erred by failing to recognize its right to voluntarily dismiss its termination-of-parental-rights petition pursuant to Rule 41(a)(1), Ala.

10

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

R. Civ. P. According to DHR, its filing of the notice to dismiss its termination-of-parental-rights action was effective upon its filing because no party had filed an answer or a motion for a summary judgment in the action. See Rule 41(a)(1); Ex parte Baumgardner-Pickle, 355 So. 3d 329, 331 (Ala. Civ. App. 2021) (explaining that "a Rule 41(a)(1)(i)[, Ala. R. Civ. P.,] dismissal does not require court action to be effective; instead, it is the plaintiff's filing of a notice of dismissal before the defendant has filed either an answer or a motion for a summary judgment that effectuates the dismissal"). Thus, DHR argues, as of the filing of its notice of voluntary dismissal, the juvenile court lost jurisdiction over the termination-of-parental-rights action. Based on that premise, DHR further argues that the juvenile court erred by holding the trial and that the July 12, 2023, judgment is therefore void. DHR further contends that, although the foster parents had filed a motion to intervene in the termination-of-parental-rights action, their failure to file a separate pleading setting out their claims, as required by Rule 24(c), Ala. R. Civ. P., prevented their ability to pursue, separate

11

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560 from DHR, the termination of the parental rights of the father and of the mother.

A petition for the writ of mandamus is the appropriate vehicle for challenging a void judgment. See Ex parte DiGeronimo, 195 So. 3d 963, 967 (Ala. Civ. App. 2015).

> "'"Mandamus is a drastic and extraordinary writ, to be issued only where there is (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court."'"

Ex parte A.M.P., 997 So. 2d 1008, 1014 (Ala. 2008) (quoting Ex parte Perfection Siding, Inc., 882 So. 2d 307, 309-10 (Ala. 2003), quoting in turn Ex parte Integon Corp., 672 So. 2d 497, 499 (Ala. 1995)).

A.  Whether the Juvenile Court Erred in Refusing to Allow DHR to Voluntarily Dismiss the Termination-of-Parental-Rights Action

As DHR argues, Rule 41(a)(1), Ala. R. Civ. P., permits a plaintiff to effectuate the dismissal of an action merely by filing a notice of dismissal, provided that the defendant has not yet filed an answer to the complaint or a motion for a summary judgment. Specifically, Rule 41(a)(1) provides, in pertinent part, that

> "an action may be dismissed by the plaintiff without order of court (i) by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs, or (ii) by filing a stipulation of dismissal signed by all parties who have appeared in the action."

According to DHR, at the time it filed its notice of dismissal, neither defendant -- i.e., neither the father nor the mother -- had filed an answer to the petition to terminate parental rights or a motion for a summary judgment.

The father had, however, filed what he had styled as a "motion to dismiss" DHR's petition to terminate parental rights. That "motion" did not specify any ground for dismissal under Rule 12(b), Ala. R. Civ. P., and instead made averments of fact to dispute the factual allegations in DHR's complaint. Thus, that "motion" qualified as an answer to DHR's complaint. See Ex parte United States Gypsum Co., 533 So. 2d 557, 560 (Ala. 1988).

In Ex parte United States Gypsum Co., our supreme court considered whether affirmative defenses asserted in a "formal answer" filed by the defendant were properly struck by the trial court as having been asserted in an untimely filed answer. 533 So. 2d at 559. Our

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

supreme court concluded that the affirmative defenses contained in the

"formal answer" filed by the defendant should not have been stricken,

explaining that

> "the original pre-trial motions, particularly the motion for judgment on the pleadings and the motion for a summary judgment, essentially served as the defendant's answer in this case. As we noted in Tuscaloosa City Bd. of Educ. v. American/Owens, Inc., 486 So. 2d 405 (Ala. 1986), '[a] motion is considered according to its substance, not its label.... Therefore, [a] motion for judgment on the pleadings may be treated as an answer....' See Kuhns v. Coussement, 412 So. 2d 779 (Ala. Civ. App. 1981), aff'd, 412 So. 2d 783 (Ala. 1982). The motions in this case were not bare-bones, boiler-plate responses to a complaint, but instead constituted an extensive denial of liability on numerous grounds."

Ex parte United States Gypsum Co., 533 So. 2d at 560.[3]  See also Kuhns

v. Coussement, 412 So. 2d 779, 782 (Ala. Civ. App. 1981) ("Nevertheless,

if the grounds marshalled by a defendant in support of his 'motion to

---

[3]Specifically, our supreme court concluded that, because the various pre-answer motions had asserted several, but not all, of the stricken defenses, the trial court should not have stricken the defenses based on the tardiness of the "formal answer" but should instead have considered whether the "formal answer" had properly amended the collective pretrial motions, which our supreme court considered to effectively serve as the defendant's answer. Ex parte United States Gypsum Co., 533 So. 2d 557, 560 (Ala. 1988).

14

dismiss' a plaintiff's complaint collectively constitute a general denial of liability to the plaintiff, a court may treat the 'motion' as an answer ....'").

Because the father's "motion to dismiss" was, in effect, an answer to the petition, DHR was not permitted to voluntarily dismiss its petition to terminate the parental rights of the father and of the mother pursuant to Rule 41(a)(1) merely by filing a notice of dismissal. Notably, no party made such a contention before the juvenile court, however. In any event, the juvenile court permitted DHR to dismiss its petition and did not require DHR to litigate the termination-of-parental-rights action. See Rule 41(a)(2), Ala. R. Civ. P. (providing for voluntary dismissal by the plaintiff by order of court).

B.    Whether the Juvenile Court Erred by Allowing the Foster Parents to Prosecute a Termination-of-Parental-Rights Action

DHR contends that the juvenile court erred in allowing the foster parents to prosecute the termination-of-parental-rights petition after DHR's action was voluntarily dismissed. DHR argues that the foster parents had merely "intervened" in DHR's termination-of-parental-rights action and had not sought particular relief by filing a pleading specifically seeking the termination of the parental rights of the father

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

and of the mother. Although Rule 24(c), Ala. R. Civ. P., requires that a person desiring to intervene in an action file both a motion to intervene and "a pleading setting forth the claim or defense for which intervention is sought," the foster parents' failure to file such a pleading with their motion to intervene is not fatal to their ability to proceed with an action to terminate the parental rights of the father and of the mother. See Morris House Condo Ass'n v. Hirschfield, 275 So. 3d 534 (Ala. Civ. App. 2018); Harrison v. Harrison, 733 So. 2d 435 (Ala. Civ. App. 1999) (plurality opinion); Massey v. Massey, 410 So. 2d 422 (Ala. Civ. App. 1981). Our supreme court has stated that, "[i]n the ordinary case, Rule 24[, Ala. R. Civ. P.,] is to be liberally construed to allow intervention." Hughes v. Newton, 295 Ala. 117, 120, 324 So. 2d 270, 273 (1975); see also Kids Klub II, Inc. v. State Dep't of Hum. Res., 763 So. 2d 259, 260 (Ala. Civ. App. 2000). In addition, our supreme court has explained that

> "[o]rdinarily, Rule 24[, Ala. R. Civ. P.,] anticipates potential future litigation brought by or involving the intervenor. The purpose of allowing intervention in such cases is to discourage multiplicity of litigation and to relieve the intervenor from the possible prejudice of 'stare decisis in later litigation involving the same questions of law and fact to which the unsuccessful applicant for intervention is finally a party.'"

16

Hughes, 295 Ala. at 120, 324 So. 2d at 273 (quoting Committee Comments on 1973 Adoption of Rule 24).

To those ends, when compliance with the requirement that an intervenor file a separate pleading has been made an issue on appeal, we have considered whether a motion to intervene itself, together with other filings made contemporaneously therewith, indicate the relief sought by the intervenor and the grounds for that relief. Hirschfield, 275 So. 3d at 539; Harrison, 733 So. 2d at 437; Massey, 410 So. 2d at 424. In Hirschfield, for example, we construed a "'notice of attorney's lien and motion for attorney fees'" as a proper motion to intervene and accompanying pleading because, we concluded, the "motion … disclosed [Hirschfield's] desire to participate in the action between the [original parties to the action] in an effort to protect his fees." Hirschfield, 275 So. 3d at 539. In Massey, we treated the motion to intervene as sufficient despite the lack of a separate pleading because, we stated, "[t]he motion set out the reason for intervention, the grounds therefor and the relief sought." 410 So. 2d at 424. Like DHR in the present case, in Harrison, "the wife argue[d] that [the] motion to intervene [filed by her former

17

husband's attorney] was not a pleading and that [the attorney] failed to file with his motion a pleading setting forth the claim for which he sought intervention." 733 So. 2d at 437. Upon our review of the attorney's "motion, his amendment to the motion, and the accompanying documents," a plurality of this court concluded that the attorney had "sufficiently complied with Rule 24(c)[, Ala. R. Civ. P.]" Id.

The verified motion to intervene filed by the foster parents sets out the following averments of fact: the child had been living with the foster parents since February 2022; the foster parents claimed an interest in the child's safety and wellbeing; they desired custody of the child; they planned to adopt the child; the child was bonded to them; and removal of the child from their care would be detrimental to the child. The motion specifically stated that the foster parents desired to intervene to further their goal of adoption of the child. They stated that "their claims or defenses and the main action have questions of law or fact in common" and that "[t]he present matter and the [foster parents'] claims involve the same questions of fact pertaining to the best interest of the minor child, and the child's ongoing dependency with regards to the natural parents."

18

The foster parents also identified their interests as being aligned with those issues being litigated in the termination-of-parental-rights action, explaining that the issues in both their claims and the pending termination-of-parental-rights action "are all potential issues in custody or future adoption proceedings." They requested no specific relief other than to be allowed to intervene, but they also sought "such further and additional relief to which they may be entitled and which furthers the best interest of the child."

Although the motion to intervene did not specifically contain a stated claim seeking termination of the parental rights of the father and of the mother, the implication that the foster parents sought to join in DHR's claim to terminate the parental rights of the mother and of the father is inescapable. See, e.g., Piambino v. Bailey, 757 F.2d 1112, 1121 (11th Cir. 1985) (explaining that "the majority of circuits, including this circuit, [have chosen] instead to disregard nonprejudicial technical defects" in motions to intervene and concluding that a "failure to annex a complaint to [the intervenor's] motion to intervene could not possibly have prejudiced the plaintiff-class or the defendants in this case.

19

Everyone knew the nature of [the intervenor's] claims for relief; they were the very claims Lead Counsel had asserted in their complaint"). Furthermore, other filings made by the foster parents more robustly indicated that they desired that the rights of the father and of the mother be terminated. For example, in their response to the motion to intervene filed by the cousin, the foster parents explained that the cousin's request to intervene came too late and that termination of the parental rights of the father and of the mother should proceed based on the facts demonstrating their abandonment of the child. Moreover, the foster parents, in their opposition to the cousin's motion to intervene, reiterated the bond between themselves and the child and, citing Ala. Code 1975, § 12-15-319(a)(13), pointed out that the juvenile court must consider that bond when determining whether to terminate the parental rights of the father and of the mother.

In addition to filing their motion to intervene, which the juvenile court granted without apparent objection from any other party,[4] and to

_____

[4]As previously noted, however, DHR filed a motion to remove the foster parents as intervenors on the morning of the trial.

contesting the cousin's motion to intervene, the foster parents filed a response to the father's "motion to dismiss," filed a motion seeking to have DHR relieved of the duty to make reasonable efforts, and filed a trial brief on the issue of "last-minute" efforts made in anticipation of the trial on the termination-of-parental-rights petition. At every turn, it is apparent that the foster parents were advocating for the termination of the parental rights of the father and of the mother so that they could move forward with their plan to adopt the child. We therefore conclude that the foster parents' failure to file a pleading with their motion to intervene is not fatal to their ability to act as party plaintiffs and to seek the termination of the parental rights of the father and of the mother after DHR dismissed its petition.[5]

In light of our conclusion that the father's "motion to dismiss" was, in fact, an answer to DHR's petition to terminate his parental rights, DHR lacked the ability to voluntarily dismiss its petition to terminate

---

[5]We note that DHR has not objected on appeal to the foster parents' having been allowed to intervene in the termination-of-parental-rights action (which, we note, DHR did not oppose in the juvenile court) or to the implicit denial of its motion to have them removed as intervenors.

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

the parental rights of the father and of the mother under Rule 41(a)(1) merely by filing a notice of such dismissal. However, the dismissal of DHR's petition was accomplished pursuant to Rule 41(a)(2) when the juvenile court permitted DHR to dismiss its petition and to withdraw from the proceeding. The foster parents had properly intervened, initially without objection, and their motion to intervene, together with other filings, clearly evinced their intent to seek the termination of the parental rights of the father and of the mother, such that their failure to file a pleading stating that claim was not fatal to their ability to prosecute such claim. Having determined that the juvenile court did not err in permitting the foster parents to litigate the issue of the termination of the parental rights of the father and of the mother, we deny the petition for the writ of mandamus and turn now to the arguments of the father and of the mother relating to the sufficiency of the evidence supporting the July 12, 2023, judgment terminating their parental rights.

## II. The Appeals

In their respective appeals, the father, the mother, and DHR all challenge the juvenile court's refusal to permit DHR to voluntarily

22

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

dismiss its termination-of-parental-rights action and to permit the foster parents to prosecute a termination-of-parental-rights action after DHR's action was dismissed; however, that issue was resolved in our discussion of DHR's petition for the writ of mandamus.[6] In their appeals, the father and the mother each challenge the sufficiency of the evidence regarding the juvenile court's conclusions that the child remained dependent, that DHR had made reasonable efforts to rehabilitate them, and that no viable alternative to the termination of their parental rights existed. In its appeal, DHR also challenges the juvenile court's authority to award permanent custody of the child to Kids to Love without the juvenile court

---

[6]Although the mother and the father briefly contend in their respective briefs, without citation to supporting authorities, that their due-process rights were violated because they lacked notice that the foster parents were separately seeking to terminate parental rights, we note that, having determined that the motion to intervene, coupled with other filings of the foster parents, supported the conclusion that the foster parents were indeed seeking termination of the parental rights of the mother and of the father, we need not consider the brief due-process arguments of the mother or of the father. See Morris House Condo Ass'n v. Hirschfield, 275 So. 3d 534, 539 (Ala. Civ. App. 2018) (rejecting the appellant's argument that it lacked sufficient notice of the intervenor's claim because the appellant had not challenged the trial court's order permitting intervention and because the appellant had responded to the intervenor's claim at a hearing).

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

having had before it evidence indicating that Kids to Love was able and

willing to take custody of the child.

The termination of parental rights is governed by Ala. Code 1975,

§ 12-15-319.  That statute reads, in part:

> "(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In a hearing on a petition for termination of parental rights, the court shall consider the best interests of the child. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
>
>> "(1) That the parents have abandoned the child, provided that in these cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
>>
>> "....
>>
>> "(13) The existence of any significant emotional ties that have developed between the child and his or her current foster parent or parents, with additional consideration given to the following factors:

24

"a. The length of time that the child has lived in a stable and satisfactory environment.

"b. Whether severing the ties between the child and his or her current foster parent or parents is contrary to the best interest of the child.

"c. Whether the juvenile court has found at least one other ground for termination of parental rights.

"....

"(d) A rebuttable presumption that the parents are unable or unwilling to act as parents exists in any case where the parents have abandoned a child and this abandonment continues for a period of four months next preceding the filing of the petition. Nothing in this subsection is intended to prevent the filing of a petition in an abandonment case prior to the end of the four-month period."

Section 12-15-301(1), Ala. Code 1975, defines "abandonment" as:

"A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."

The test a juvenile court must apply in a termination-of-parental-

rights action is well settled:

> "A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So. 2d 950, 954 (Ala. 1990)."

B.M. v. State, 895 So. 2d 319, 331 (Ala. Civ. App. 2004). A juvenile court's judgment terminating parental rights must be supported by clear and convincing evidence. P.S. v. Jefferson Cnty. Dep't of Hum. Res., 143 So. 3d 792, 795 (Ala. Civ. App. 2013). "Clear and convincing evidence" is "'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'" L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002) (quoting Ala. Code 1975, § 6-11-20(b)(4)). Although a juvenile court's factual findings in a judgment terminating parental rights based on evidence presented ore tenus are presumed correct, K.P. v. Etowah Cnty. Dep't of Hum. Res., 43 So. 3d 602, 605 (Ala. Civ. App. 2010), "[t]his court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that

26

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

the juvenile court could have found to be clear and convincing." K.S.B. v.

M.C.B., 219 So. 3d 650, 653 (Ala. Civ. App. 2016). That is, this court

> "'must ... look through ["the prism of the substantive evidentiary burden," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986),] to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would "produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion."'"

K.S.B., 219 So. 3d at 653 (quoting Ex parte McInish, 47 So. 3d 767, 778

(Ala. 2008), quoting in turn Ala. Code 1975, § 25-5-81(c)).

A.   Whether the July 12, 2023, Judgment Terminating the Parental Rights of the Father and of the Mother Is Supported by Clear and Convincing Evidence

The father and the mother both challenge the evidence supporting

the juvenile court's conclusions that they abandoned the child, that the

child remained dependent, that DHR made reasonable efforts to

rehabilitate them, and that no viable alternative to the termination of

their parental rights existed. We must therefore evaluate the evidence

supporting the juvenile court's judgment. A review of the testimony and

exhibits admitted at the trial reveals the following facts.

27

The mother testified that she is the mother of a total of 10 children and that the child is the youngest of her children. She admitted that seven of her children had been placed in DHR's custody in March 2021. The mother's testimony concerning individualized-service-plan ("ISP") meetings and the services that DHR offered to her is initially quite noncommittal, with the mother stating, "I don't recall" and "at some point," when asked about being invited to ISP meetings or being offered particular services. She then admitted that she had been required by DHR to submit to random drug tests through the color-code program, to complete a substance-abuse assessment, to enroll in substance-abuse treatment through Aletheia House (for which, the mother said, she had volunteered), to undergo a psychological evaluation, to seek and maintain gainful employment, and to seek and maintain stable housing.

The mother admitted that, as of the time of the trial, she did not have her own residence and was living with a friend. She later testified that she was on a waiting list for subsidized housing, that the delay in securing housing was because of the size of her household (which included her plus seven children) and because she had had difficulty

securing the children's social-security numbers for the application from DHR. The mother also admitted that she had not maintained stable employment. She said that she had had several jobs during the period her children had been in DHR's custody. She explained that she had had to complete services and that, at times, she had been required to work on her services four days out of the week, four hours each day, during the midday, which, she intimated, had prevented her from either securing or maintaining employment.

The mother said that she had been arrested and incarcerated in July 2022 and that she had remained incarcerated "close to six months." She later testified that she had been released from incarceration at the end of September 2022. When presented with the ISPs, she admitted that she had not attended ISP meetings in March 2022, May 2022, July 2002, and October 2022. She commented that she had been incarcerated on the dates of "most" of those ISP meetings. Thus, it is unclear whether the mother was incarcerated only between July 2022 and September 2022 or whether she was incarcerated for a period of six months, which included that period but extended beyond it.

Regarding her visits with the child, the mother admitted that she had not seen the child between May 2022 and March 2023. In fact, she stated that she had had only three visits with the child; however, the mother may have been referring to visits that occurred after March 2023, when her visitations resumed. She said that, in September 2022, she had attempted to contact her caseworker, Megan Scott, but that Scott was hospitalized at that time. According to the mother, neither Scott nor any other caseworker had contacted her to set up visitation between her and the child. The mother explained that she had had difficulty reaching her caseworkers and that they had changed frequently. She also testified that DHR had indicated that it was having difficulty finding transporters to transport the children to and from their foster homes to visitations; she described DHR's failure to provide transportation for visitations as occurring "frequently." According to the mother, she had not been permitted to have other contact, like video-messaging or telephone calls, with the children. The mother testified that she had been entitled to visitation twice per month but that she had not been able to exercise visitation regularly because of issues with transporters or with the foster

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

parents failing to make the child available for visits; that testimony may have been referring to visitation after it resumed in March 2023 and not to visitation offered to the mother in 2022, which, as will be explained below, had been limited to once per month in the March 2022 ISP.

The ISPs contained in the record on appeal indicate that the mother initially had been allowed visitation twice per month but that her visitation had been reduced to once per month because of her noncompliance with the ISP. The March 2022, May 2022, July 2022, and August 2022 ISPs indicate that the mother was required to provide 48-hour notice that she would attend her visits, which, beginning in April 2022, had been scheduled for the second Sunday of each month. The March 2022 ISP also provided that only the mother could attend her monthly visits until progress on ISP goals was demonstrated by the mother. The May 2022 ISP noted that the worker was awaiting contact from the mother regarding visitation. The July 2022 ISP required the mother to provide proof of employment and stable housing and to "confirm services" upon her release from incarceration. The August 2022 ISP indicated that the mother was incarcerated at that time. The

October 2022 ISP contains no information regarding visitation being offered to the mother.

The mother denied having an issue with substance abuse. She said that she had volunteered to seek substance-abuse treatment at Aletheia House. She testified that she was about to graduate from the program at Aletheia House and that all the drug tests that she had taken for Aletheia House were negative for all substances. The mother did not offer the results of the drug tests administered by Aletheia House into evidence.

When questioned about positive drug- or alcohol-test results from tests administered as part of the color-code program in the six months before the trial, the mother indicated that she was unaware of those results, except for an April 2, 2023, drug test that had been positive for opiates, for which, she said, she had a prescription. She admitted that she had been informed that failing to appear for a random drug test would result in the missed test being considered a positive result. When asked, she said that that she did not know why the records from the color-code program indicated that she had missed every single random drug test for which her color had been called in 2022. The mother also testified

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

that, whenever she was assigned a new caseworker, DHR would switch her color.

The ISPs reflect that the mother's color had changed from brown to avocado a few times, with her assigned color being brown in August 2021, August 2022, and October 2022, and avocado in May 2022, July 2022, March 2023, April 2023, and June 2023. The January 2021, January 2022, and March 2022 ISPs did not require the mother to submit to random drug testing. The records from the color-code program indicate that the mother failed to submit to any random drug test for which she had been called in 2022. Interestingly, although the ISPs for January 2022 and March 2022 do not require the mother to submit to random drug testing, the records from the color-code program indicate that the mother had failed to appear for drug tests during the effective period of each of those ISPs.

According to the mother, she had been routinely submitting to drug tests since she had resumed services with DHR in March 2023. She said that she had tested negative "for the most part." When confronted with records from the color-code program indicating that she had missed drug

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

tests on April 24, 2023, May 10, 2023, May 18, 2023, May 23, 2023, June 5, 2023, and June 13, 2023, the mother denied having missed more than two drug tests, stating that she had missed one test but had made it up and that she had missed one other test because one of her other children had broken his arm that day and she had been with him at the hospital.

The mother denied having informed DHR that she had no relatives that might be considered resources for the child. She said that she had provided DHR the names of relatives several times and that relatives had reached out to DHR but that DHR had not responded to those relatives. Regarding the cousin, the mother testified that she and the cousin had been raised by the cousin's mother and that she had presented the cousin as a resource for the child. In addition, the mother testified that the cousin was a licensed foster parent and that the cousin was willing to assume the custody of the child.

The father testified that, in March 2021, the child had initially been placed in his care. He said that, at that time, he had been living with his mother, J.B. ("the paternal grandmother"), who had assisted him in caring for the child. According to the father, at that time, he was on

34

parole based on his conviction for the felony offense of possession or sale of a short-barreled rifle or shotgun. See Ala. Code 1975, § 13A-11-63(a). He said that he was arrested in 2021 for misdemeanor charges, which, he explained, had resulted in the revocation of his parole and his incarceration between June 2021 and September or October 2021.

Like the mother, the father reported that the caseworkers assigned to the child's case had changed frequently. He said that he had had difficulty reaching caseworkers to discuss the status of the case and that he had, in fact, gone to DHR's office in January 2022 or February 2022 to learn about the services he was to complete. He also reported an "informal" ISP meeting that had been held in May 2022 in the lobby of the DHR office with one caseworker who, he said, had resigned three days later; he said that he had not received any record of that ISP meeting. According to the father, he was first offered services, which, he said, included "classes" and visitation, in July 2022. He said that he did not recall having had a visit with the child in August 2022 and that he had been told that he had not been able to have those visits because DHR was having issues locating transporters.

The father said that, in August 2022, the child was assigned Scott as his new caseworker. He explained that, according to the August 2022 ISP, he was to be provided in-home services with Ms. Donnie Thompson of Youth Empowerment, that he was to participate in drug testing through the color-code program, and that he was to have visits with the child twice per month. However, the father testified that he had had only one visit with the child in September 2022. The father also reported that, pursuant to the October 2022 ISP, he was "supposed to get more visits" and that he was moving toward having unsupervised visits with the child.

The father admitted that he had visited the child once in October 2022. He said that he had tried to contact Scott in November 2022 but that she was not available because of a medical condition. He also reported having been unable to attend a December 2022 permanency hearing because he was ill. He said that he had not contacted Thompson between November 2022 and February 2023. The father also admitted that he had not visited the child after October 2022 until June 2023. He testified that he had not visited the child in May 2023 because the

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

transporter was not available and that his first unsupervised visit, which was scheduled for June 24, 2023, had not occurred.

According to the father, he had been employed for a year by a construction company. He testified that he earned $18.50 per hour, that his hours varied, that his hours were longer in the summer months, and that he was paid in cash. He further testified that he currently lived with his girlfriend, S.M. ("the girlfriend"), and her three children in a four-bedroom, three-bathroom house with a fenced-in yard; he said that he had moved in with the girlfriend in February 2022. However, he admitted that he had not been living with the girlfriend during late 2022, indicating that his relationship with the girlfriend had been unstable. He said that he was able to provide for the child that day and that, if the child were to come to live with him, the child would share a room with the girlfriend's 13-year-old son.

Regarding relative resources, the father indicated that he had provided DHR with the names of his father, D.W. ("the paternal grandfather"), and of the paternal grandmother. At trial, he indicated that the cousin would also be a potential resource for the child. He

37

testified that the paternal grandfather lived in Washington state and that the paternal grandfather may not desire to serve as a resource because, he said, the paternal grandfather was not sure that he would pass the home evaluation.

Cadara Parks testified that she was a registered play therapist who had begun working with the child in September 2021. She explained that she had treated the child between September 2021 and the summer of 2022 and again beginning in May 2023. Parks described the child as having been traumatized as a result of the events that had led to his being placed in foster care, which included being in an automobile with his mother and older half brother during a high-speed chase that had resulted in the arrest of the older half brother and some small injuries to the child. She opined that the child was bonded to the foster parents, to whom he referred as "mom" and "dad."

Diane Eckerd, the court-appointed juvenile-advocate ("CAJA") supervisor, testified that she had attended the ISP meetings held by DHR. She said that the mother did not attend any ISP meetings in 2022. She also testified that the mother had missed every single random drug

test for which her color had been called between January 5, 2022, and December 29, 2022. She admitted that the mother had told her once that a previous caseworker had told her that she did not have to take random drug tests and that the mother had been incarcerated for several months during 2022, which would have explained her inability to appear for some of the 2022 drug tests. When questioned about whether the mother had been taking drug tests at Aletheia House, Eckerd stated that she had not received any drug-test results from Aletheia House.

Regarding the father, Eckerd testified that she had spoken to him "on and off" over the past year. She said that, despite the fact that, according to the October 2022 ISP, the father was to have increased visits and to transition to unsupervised visits, the father had not visited the child after October 2022. Eckerd said that she had had very little communication with the father between October 2022 and "late spring" 2023. According to Eckerd, she had been able to reach the father by telephone on December 13, 2022, when, she said, he had reported to her that he had lost his cellular telephone and wallet, that he was not working as much, and that he had been staying with friends while

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

looking for a place to live. She testified that the father had been arrested on January 14, 2023, and charged with "certain persons forbidden to possess [a] firearm." See Ala. Code 1975, § 13A-11-72. She testified that she would not consider the father's appearance at 35% of the drug tests for which his color had been called to be compliant with his case plan. Eckerd admitted, however, that some of the father's failures to appear for random drug tests might have been due to the fact that he had lost his telephone and his wallet and had not had stable housing between October 2022 and February 2023.

Eckerd also admitted that the child's case had been assigned "a lot" of caseworkers. She indicated that the frequency in the change of caseworkers had exacerbated issues with visitation, with therapy services for the child, and with services for the father and the mother. She also noted that DHR had had issues with locating persons to transport all of the children for visitations with the father and the mother.

According to Eckerd, she had contacted the paternal grandfather on December 5, 2022, about serving as a resource for the child. She

testified that he had indicated to her that he wanted to "think about it." She said that he had disclosed that he was separated from his current wife. Eckerd stated that she had telephoned the paternal grandfather again on January 3, 2023, and on February 27, 2023, that her calls had not been answered, and that there had been no way to leave a message. She said that she had also attempted to communicate with the paternal grandfather by e-mail on February 27, 2023, but that he had not responded. She further testified that a CAJA report from October 2022 had listed the cousin as a relative resource.

Eckerd indicated that her concerns about the father included his lapse in communicating with DHR, CAJA, and Thompson during late 2022. She also indicated that she was concerned that, during that same period, the father had not had stable housing. Regarding the mother, Eckerd testified similarly, remarking that the mother had not participated or communicated with DHR for "a good long time."

The paternal grandmother testified that the child had burn marks on his body when he had come to live with her in March 2021. She said that the child would hit his head repeatedly on the wall, would kick and

punch the wall, and would cry for hours. She explained that she would hold and rock the child to soothe his crying but that he would continue to cry. She said that she had asked DHR for assistance and had suggested to DHR that the child might need therapy, but, she said, DHR was slow to respond to her and had not made any arrangements to assist her with the child or to provide the child with therapy. According to the paternal grandmother, the father had lived with her between March 2021 and June or July 2021 and had assisted her with the care of the child during that period. She testified that she had been unable to retain custody of the child after the father was incarcerated and that she had relinquished him to DHR because she could not handle his behavior. She explained that she did not have a problem having the child in her home but that she would want to have "help to take him to therapy and show me how to handle [the child]."

The cousin testified that she had learned that the child had been in foster care seven months before the trial. According to the cousin, she had observed the mother with the child at visits at DHR's offices, at the mother's home, and at her own home. The cousin said that she did not

have any concerns about the ability of the father or of the mother to provide care for the child.

The foster mother testified that, when the child had first begun to live in the foster parents' home in February 2022, he would wake up at night screaming and would cry uncontrollably. She also said that he would hit and scratch himself. She testified that those behaviors had lessened over time but that some had resumed when he began visiting with the mother again in March 2023; she recounted that, the night after the child had resumed visiting with the mother in March 2023, the child woke up screaming five times. According to the foster mother, the child's behavior at preschool had also worsened after visitations with the mother had resumed. She said that he had begun throwing furniture in the classroom. The foster mother recalled that the mother had not visited the child between either March 2022 or May 2022 and March 2023.

Regarding the father, the foster mother testified that she had initially been unaware that he was "in the picture." She explained that she had first learned that the father was interested in visiting with the child at an ISP meeting in 2022 and that visitations had been discussed

43

at the July 2022 ISP meeting. She recalled that, after the child's first visit with the father in the fall of 2022, the child had asked if he had to "do that again." According to the foster mother, the father's last visit in 2022 was on October 8, 2022. She testified that Thompson had informed her that the father had not contacted her after the October 2022 ISP meeting. She said that the father had not resumed visits with the child until June 10, 2023.

Jamie Stephens, the guardian ad litem for the child, testified that the child was very rambunctious, hard-headed, smart, and animated. Like the foster mother, he recounted the child's behaviors when he was first placed in foster care as crying and screaming at night, hitting himself, and banging his head against the wall. He also testified that the foster mother had reported that some of the child's behaviors had returned when he had resumed visiting with the mother.

He opined that the mother was "not 100% committed to having all of her children in the same place." He also indicated that the mother had not had contact with the child for "an extended period." He also indicated that, in his opinion, the mother had not been "compliant," presumably

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

with the ISPs. Thus, he said, he recommended that the mother's parental rights be terminated.

Regarding the father, Stephens remarked that "he's gone for periods of time being involved to not [being] involved and then being involved again." Stephens stated that the father "was not involved at all" between October 2022 and March 2023, and he rejected the father's excuses for failing to keep in contact with DHR or the child during that period. He also recommended that the father's parental rights be terminated.

1. Dependency of the Child

The juvenile court determined that the child remained dependent at the time of the entry of the July 12, 2023, judgment terminating the parental rights of the father and of the mother. Specifically, the juvenile court found that the father and the mother had abandoned the child. The July 12, 2023, judgment also listed other factors supporting the conclusion that the father and the mother were unable or unwilling to discharge their responsibilities as parents, but, in light of our conclusion, discussed infra, that sufficient evidence supports the juvenile court's

45

findings that the father and the mother abandoned the child, we need not recount those other factors.

The evidence presented to the juvenile court regarding the father unquestionably supports the conclusion that the father, after receiving notice that his visitation would increase and might even become unsupervised, had taken no steps to contact Thompson, who was to supervise that visitation, and had only once attempted to contact Scott regarding his November 2022 visitation. The father's excuse for failing to maintain contact with DHR, Thompson, or CAJA between the October 2022 ISP meeting and February 2023 was that he had lost his cellular telephone, had lost his wallet, and was relying on friends for housing. For more than four months preceding the filing of DHR's petition for the termination of his parental rights in February 2023, the father had simply stopped making any effort to comply with the ISPs or to visit with the child. Thus, pursuant to § 12-15-319(d), a rebuttable presumption that the father was "unable or unwilling to act as [a] parent[]" arose. Even had that presumption not arisen, the juvenile court had ample evidence from which it could have concluded that the father's failure to

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

make any effort to contact or communicate with the child for the period between his last visit with the child on October 8, 2022, and his attendance at the March 2023 ISP meeting was sufficient to support the conclusion that the father had abandoned the child. Because the evidence supports the juvenile court's conclusion that the father abandoned the child, the juvenile court was not required to consider whether DHR had made reasonable efforts to reunite him with the child, see § 12-15-319(a)(1), or whether viable alternatives to the termination of his parental rights existed. See G.S. v. Cullman Cnty. Dep't of Hum. Res., 253 So. 3d 383, 398 (Ala. Civ. App. 2017) (quoting C.F. v. State Dep't of Hum. Res., 218 So. 3d 1246, 1251 (Ala. Civ. App. 2016)) (explaining that, "'[w]hen a [parent] abandons [his] child[] and no longer maintains a significant parental relationship with [his] child[], [that parent] loses [the] right to compel the state to exhaust viable alternatives before terminating [his] parental rights'"). Accordingly, we affirm the July 12, 2023, judgment terminating the parental rights of the father.

The evidence relating to the mother is similarly supportive of the determination that the mother abandoned the child. Although the exact

47

date the mother was released from her incarceration in 2022 is not entirely clear, she testified that she was released from incarceration in September 2022. The ISPs reflect that the mother was required to contact DHR 48 hours before the date of her monthly visitation, which was scheduled for the second Sunday of each month, to verify that she would be exercising visitation. The July 2022 ISP indicated that the mother had been required to provide proof of employment and stable housing and to "confirm services" once she was released from incarceration. The mother testified that she had attempted to contact Scott once in September 2022. She further testified that neither Scott nor any other caseworker had contacted her to set up visitation, which, according to the ISPs, had already been established for every second Sunday, provided the mother contacted DHR 48 hours before the scheduled visitation. The mother also complained that she had been informed "frequently" that DHR lacked transporters to transport the children to and from visitations with her, but the mother was not clear about whether DHR had had those issues during 2022 or after she had resumed visitations in March 2023.

The juvenile court could have concluded that the mother had failed to make the appropriate contact with DHR to ensure that she could visit with the child on the scheduled visitation dates. Eckerd testified that the mother had not maintained contact with DHR or CAJA for "a good long time," and Stephens testified that the mother had not participated in her reunification plan or visited with the child for a period of nine months. In addition, the ISPs reflect, and Eckerd testified, that the mother did not attend a single ISP meeting in 2022. Although the evidence could be viewed differently, the juvenile court observed the mother during her testimony and could have determined that her answers were evasive or untruthful and used that as a basis to reject the truthfulness of some or all her testimony. See Hall v. Mazzone, 486 So. 2d 408, 410 (Ala. 1986) ("The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses."); Summers v. Summers, 58 So. 3d 184, 188 (Ala. Civ. App. 2010) ("It is the province of the trial courts to estimate the credibility of witnesses, and if the trial court concludes that a witness was willfully untruthful, that court may disregard any or all of

49

that witness's testimony."); Bunn v. Bunn, 628 So. 2d 695, 697 (Ala. Civ. App. 1993) ("[T]he trial court may disbelieve and disregard portions of testimony and should accept only that testimony it considers worthy of belief."). Because the evidence supports the juvenile court's conclusion that the mother abandoned the child, the juvenile court was not required to consider whether DHR had made reasonable efforts to reunite her with the child, see § 12-15-319(a)(1), or whether viable alternatives to the termination of her parental rights existed. See G.S., 253 So. 3d at 398. Accordingly, we also affirm the July 12, 2023, judgment terminating the parental rights of the mother.

2. Whether the Juvenile Court Erred By Awarding Custody of the Child to Kids to Love

DHR argues that the juvenile court could not have awarded custody of the child to the child-placing agency Kids to Love because, it says, the juvenile court had no evidence before it at the time of the entry of the July 12, 2023, judgment indicating that Kids to Love was able and willing to take custody of the child. Indeed, Ala. Code 1975, § 12-15-320(b)(1), provides that, when a juvenile court has terminated the parental rights of a child's parents, it may "[t]ransfer or continue the permanent legal

50

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

custody of the child … to any public or private licensed child-placing agency able and willing to assume the care and maintenance of the child." The juvenile court addressed the fact that DHR had withdrawn from prosecuting the termination-of-parental-rights action and stated on the record that it might need a licensed child-placing agency with which to place the child if it terminated the parental rights of the father and of the mother; the juvenile court suggested that counsel for the foster parents look for a licensed child-placing agency during the lunch break on the second day of the trial. Upon return from the lunch break, counsel for the foster parents announced that they had an agreement with Kids to Love and proffered that Kids to Love was a licensed child-placing agency that was able and willing to take custody of the child. Neither the father nor the mother objected to Kids to Love being offered as a potential custodial placement on the ground that the juvenile court lacked evidence indicating that Kids to Love was able and willing to assume custody of the child.

After the entry of the July 12, 2023, judgment, DHR filed a postjudgment motion in which it challenged, among other things, the lack

51

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

of evidence supporting the award of custody of the child to Kids to Love on the basis that the juvenile court had no evidence before it indicating that Kids to Love was "able and willing" to assume custody of the child. The juvenile court held a hearing on the postjudgment motions filed by DHR, the father, and the mother, at which the various counsel for the father, the mother, the foster parents, and DHR appeared; in addition, counsel for Kids to Love appeared. Over the objection of DHR, the juvenile court permitted counsel for the foster parents to question a representative of Kids to Love about its being able and willing to assume custody of the child. That representative, Tracy Miller, answered the questions whether Kids to Love was able and willing to assume custody of the child in the affirmative.[7] After the hearing, the juvenile court denied DHR's postjudgment motion.

---

[7]In their responsive brief on appeal, the foster parents repeatedly represent that the juvenile court heard certain other "evidence" regarding Kids to Love and its ability and willingness to accept custody of the child, despite the fact that the "evidence" to which they cite comprises solely of statements of counsel. It is well settled that unsworn statements made by counsel during a trial are not evidence. See S.B.H. v. R.P., 278 So. 3d 1237, 1242 (Ala. Civ. App. 2018) (quoting Tucker v. Nixon, 215 So. 3d 1102, 1105 (Ala. Civ. App. 2016)).

DHR argues that the juvenile court could not accept the testimony of Miller at the postjudgment hearing because, it says, the evidence regarding the ability and willingness of Kids to Love to assume the custody of the child was "new" evidence, which, it contends, cannot be considered on a postjudgment motion. See Marsh v. Smith, 67 So. 3d 100, 107-08 (Ala. Civ. App. 2011) (explaining that a trial court may consider newly discovered evidence submitted in support of a postjudgment motion but that it cannot consider new evidence, which is evidence that came into being after the entry of the judgment). In response, the foster parents first argue that, because DHR "fail[ed] to participate in the [termination-of-parental-rights] proceeding[], DHR failed to raise any argument contrary to any of the juvenile court's findings." However, as we have just explained, DHR raised this very issue in its postjudgment motion.

The foster parents do not respond to DHR's argument that the juvenile court could not consider the testimony of Miller at the hearing on the postjudgment motions because that evidence was "new." However, the evidence that the foster parents submitted at the postjudgment

hearing was not "new evidence." See Marsh, 67 So. 3d at 107-08. Because counsel for the foster parents had contacted Kids to Love on the second day of the trial and because Kids to Love had indicated to counsel for the foster parents that it was licensed and was both able and willing to assume custody of the child, that evidence, although not presented at the trial, existed at the time of the trial.

In any event, because none of the parties to the termination-of-parental-rights trial objected at trial to the suggestion that Kids to Love be utilized as a custodial-placement option if the juvenile court terminated the parental rights of the father and of the mother, the juvenile court could have concluded that testimony to establish the ability and willingness of Kids to Love to accept custody of the child was not required. Once DHR filed its postjudgment motion, however, the juvenile court was faced with a new legal argument: that evidence to support the conclusion that the child could be placed with Kids to Love must have been presented at trial. See R.W.S. v. C.B.D., 244 So. 3d 987, 996 (Ala. Civ. App. 2017) ("A trial court has the discretion, but is not required, to consider new legal arguments advanced for the first time in

a postjudgment motion."). The juvenile court then determined that, because DHR would not stipulate to Kids to Love's ability and willingness to accept custody of the child, the foster parents should be permitted the opportunity to present such evidence. That is, the juvenile court appears to have exercised its discretion under Rule 59(a), Ala. R. Civ. P., to "open the judgment ... [and] take additional [evidence]." Although the more proper action for the juvenile court to have taken would have been for it to have granted DHR's motion, in part, to have set aside the dispositional portion of the termination-of-parental-rights judgment, to have taken the additional evidence, and then, after having done so, to have entered an amended judgment, see Rule 59(a), the effect of the juvenile court's series of actions in this matter was the same -- it remedied the lack of evidence to support the conclusion that Kids to Love was able and willing to serve as a placement for the child. DHR has not advanced an argument indicating that its rights were prejudiced by the juvenile court's actions. See Rule 45, Ala. R. App. P. ("No judgment may be reversed ... unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the

55

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

error complained of has probably injuriously affected substantial rights of the parties."). Accordingly, we reject DHR's argument that the juvenile court's judgment, insofar as it awarded custody of the child to Kids to Love, should be reversed.

Conclusion

Having determined that DHR could not voluntarily dismiss its termination-of-parental-rights action pursuant to Rule 41(a)(1) and that the juvenile court properly permitted the foster parents to prosecute a termination-of-parental-rights action as intervenors, we deny DHR's petition for the writ of mandamus. We have rejected the arguments of the father and the mother regarding the sufficiency of the evidence supporting the July 12, 2023, judgment terminating their parental rights. We have also rejected DHR's argument relating to the juvenile court's disposition of the child by placing the child in the custody of Kids to Love. Accordingly, the July 12, 2023, judgment terminating the parental rights of the father and of the mother and placing the child in the custody of Kids to Love is affirmed.

56

CL-2023-0524, CL-2023-0553, CL-2023-0555, and CL-2023-0560

CL-2023-0524 -- PETITION DENIED.

CL-2023-0553 -- AFFIRMED.

CL-2023-0555 -- AFFIRMED.

CL-2023-0560 -- AFFIRMED.

Hanson and Lewis, JJ., concur.

Moore, P.J., and Fridy, J., concur in the result, without opinions.